STATE EX REL. IVANHOE S. WAYNE

*v.*

EDGAR B. SIMS, AUDITOR

(No. 10759)

Submitted September 27, 1955. Decided November 22, 1955.

*M. E. Boiarsky, Milton S. Koslow,* for relator.

*John G. Fox,* Attorney General, *Charles R. McElwee,* Assistant Attorney General, for respondent.

BROWNING, JUDGE:

Relator, Ivanhoe S. Wayne, seeks a peremptory writ of mandamus, directed to Edgar B. Sims, Auditor of the State of West Virginia, requiring him to honor relator's requisitions for salary due for serving as Director of the Bureau of Negro Welfare and Statistics.

The relator alleges the creation of this Bureau, and the provision that it was to be in the charge of a Director, appointed by the Governor, by and with the consent and advice of the Senate, to hold office for four years, unless sooner removed according to law. The petition then alleges the appointment of C. F. Hopson as Director for

the term expiring June 30, 1953. On June 24, 1953, the Governor again appointed Hopson "until the next meeting of the Senate", which appointment was amended and corrected on January 7, 1955, to read "for a term of four years, effective July 1, 1953 and ending June 30, 1957." The Senate, on March 12, during the Regular Session of the Legislature, 1955, rejected the appointment of Hopson. The petition then alleges the appointment of relator as such Director on March 15, 1955, and on March 16, 1955, his qualification and entry upon his duties.

Under date of April 20, 1955, the Governor issued a proclamation calling the Legislature into Extraordinary Session on May 9, 1955, stating that such call was by virtue of the provisions of Article VII, Section 7 of the Constitution of this State, and limiting the session to consideration of matters incident to the school system, and to the appropriation of the money necessary to finance the Extraordinary Session. On May 10, 1955, the Governor submitted to the Senate a list of nominations to various offices, but the name of the relator was omitted. Consequently, on May 13, 1955, the Legislature adjourned the Extraordinary Session without the name of the relator having been considered by the Senate.

The petition then sets forth the salary claimed as due by the relator, his requisition therefor to the Auditor, and the Auditor's refusal to honor such requisition, and concludes with the prayer for a peremptory writ of mandamus.

The Auditor demurred to the petition on the ground that it shows on its face that respondent has no clear legal duty to honor relator's requisitions because: (1) Relator's appointment expired upon the adjournment of the Senate on May 13, 1955; (2) the Governor did not nominate relator as Director at the next meeting of the Senate following his appointment on March 15, 1955; and (3) the Senate did not consent to the appointment

of relator at its next meeting after his appointment on March 15, 1955.

The facts stipulated by counsel are briefly as follows: (A) There have been 32 Extraordinary Sessions of the Legislature since 1872, each of which was called pursuant to Article VII, Section 7 of the Constitution; (B) That of these 32, the subject of consideration of gubernatorial appointments was included in only 2 of the calls; (C) That the Senate acted upon gubernatorial appointments at 14 Extraordinary Sessions; (D) That the Senate did not act upon gubernatorial appointments at 5 Extraordinary Sessions; (E) That, at 11 of the Extraordinary Sessions there were no gubernatorial appointments to be acted upon; and (F) That, since March 14, 1955, the date of the adjournment of the Regular Session, the Governor has made but one appointment to the office of Director of the Bureau of Negro Welfare and Statistics, which is that of the relator.

It should be observed at the outset that the determination of the status of Hopson, which is necessarily incident to an adjudication of the issues presented herein, does not preclude him from any right or title which he may have to the office in question since Hopson is not a party to this proceeding. *Stowers* v. *Blackburn, et al.,* 141 W. Va. 328 90 S. E. 2d. 277.

The office of Director of the Bureau of Negro Welfare and Statistics is a public office created by the Legislature, Code, 29-5-1, pursuant to Article IV, Section 8 of the West Virginia Constitution. Mandamus is a proper remedy by a de jure official to secure payment of his salary for services rendered in such office. *Downey* v. *Sims,* 125 W. Va. 627, 26 S. E. 2d. 161. However, by the great weight of authority, a de facto officer cannot by mandamus, or other suit or action, recover the salary belonging to the office which he is filling. *Brandon* v. *The Board of Control,* 84 W. Va. 417, 100 S. E. 215.

The controlling question then is whether the relator has the title to the office of Director of the Bureau of

Negro Welfare and Statistics, and this issue is presented by the facts alleged in the petition and the demurrer thereto. Neither the Legislature, the Governor, nor any other official has any inherent power to appoint anyone to a public office. That power rests only in the people of this State, and in those to whom it has been delegated, by the people through their Constitution, or by valid legislative enactments pursuant thereto. It is necessary, therefore, to look to the Constitution primarily, and to the Acts of the Legislature, to resolve the issue here presented. Article IV, Section 8 of the Constitution of this State, provides that: "The Legislature, in cases not provided for in this Constitution, shall prescribe, by general laws, the terms of office, powers, duties and compensation of all public officers and agents, and the manner in which they shall be elected, appointed and removed."

The office in question in this proceeding is not a constitutional office, but was created by the Legislature by the provisions of Code, 29-5-1, which reads as follows: "The bureau of Negro welfare and statistics, heretofore established, shall be continued. It shall be in charge of a director who shall be a member of the Negro race, to be appointed by the governor, by and with the advice and consent of the senate, and shall hold office for four years, unless sooner removed according to law."

Sections 8 and 9 of Article VII of the Constitution provide:

Section 8: "The Governor shall nominate, and by and with the advice and consent of the Senate, (a majority of all the Senators elected concurring by yeas and nays) appoint all officers whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officers shall be appointed or elected by the Legislature."

Section 9: "In case of a vacancy, during the recess of the Senate, in any office which is

not elective, the Governor shall, by appointment, fill such vacancy, until the next meeting of the Senate, when he shall make a nomination for such office, and the person so nominated, when confirmed by the Senate, (a majority of all the Senators elected concurring by yeas and nays) shall hold his office during the remainder of the term, and until his successor shall be appointed and qualified. No person, after being rejected by the Senate, shall be again nominated for the same office, during the same session, unless at the request of the Senate; nor shall such person be appointed to the same office during the recess of the Senate."

The relator contends that Section 9 is inapplicable since there was no vacancy in the office of the Director at the time of his appointment. This contention is based upon the provision of Code, 6-5-2, which reads: "The term of every officer shall continue (unless the office be vacated by death, resignation, removal from office, or otherwise) until his successor is elected or appointed, and shall have qualified."

The initial question of the import of the refusal of the Senate to confirm a gubernatorial appointment for a full term during the recess of the Senate is presented. Hopson was appointed to such a term as Director, effective July 1, 1953, and ending June 30, 1957. This Court holds that when the Senate failed to give its "consent" to the appointment, as provided by Code, 29-5-1, a vacancy was created in the office, which Hopson theretofore had filled by virtue of the interim appointment by the Governor. To hold otherwise would be to emasculate the constitutional and statutory provisions requiring the consent of the Senate to an appointment or nomination by the Governor. If Hopson could hold over until his successor was appointed and qualified, under the provisions of Code, 6-5-2, the failure of the Senate to consent to his appointment would be of no consequence. Clearly, it was not the intention of the writers of the Constitution, and of the people of this State who adopted it, that such

a situation should prevail as to appointees to office where the authority to select such was divided between the head of the Executive branch of the government and the Upper House of the Legislature.

In *State ex rel, Brandon* v. *The Board of Control,* 84 W. Va. 417, 100 S. E. 214, Brandon was appointed to the office of Forest, Game and Fish Warden by the Governor on the 20th day of February, 1918, and the Senate, at its Regular 1919 Session rejected the appointment, and the Governor, being of opinion "that this left the office vacant thereupon appointed said Harding and commissioned him thereto." The Court said: "* * * We are, therefore, of the opinion that under the act, as it now stands, it was necessary to the validity of this appointment that the same be submitted to the senate for its action thereon, and that the refusal of the senate to confirm the relator's appointment to the office determines his title thereto. * * * "

In *State ex rel. Fox* v. *Brewster,* 140 W. Va. 235, 84 S. E. 2d. 231, this Court said: "* * * The Legislature by the use of the words * * * 'by and with the advice and consent of the Senate' intended that an appointment made during a legislative interim should be subject to confirmation by the Senate when convened. * * * "

The vacancy which is thus created, by failure of the Senate to consent to an appointment by the Governor, is to be distinguished from the vacancy contemplated by the provisions of Code, 6-5-2, and by the many decisions of this Court holding that where an official, elective or appointive, holds over after the expiration of a term, a vacancy does not exist until it is filled by an appointment or election, or, in a proper case, a vacancy is declared by competent authority. *Calley* v. *Blake, et al.,* 126 W. Va. 696, 29 S. E. 2d. 634; *State ex rel. Jones* v. *Ingram, et al.,* 135 W. Va. 548, 63 S. E. 2d. 882; *State ex rel. Sommers* v. *Dowell, et al.,* 82 W. Va. 240, 95 S. E. 861; *State ex rel. Hatfield* v. *Farrar,* 89 W. Va. 232, 109 S. E. 240; *Kline* v. *McKelvey,* 57 W. Va. 29, 49 S. E. 896. *Broadwater* v. *Boothe, et al.,* 116 W. Va. 274, 180 S. E. 108, may be

distinguished from this case, although the analogy drawn in the opinion between the authority and action of the Mayor and City Council of Belington, under the applicable statutory provisions, and the power of the Governor and the Senate in making an appointment where the approval of the latter is necessary, was inopportune.

In the recent case of *State ex rel. Fox* v. *Brewster, supra,* it was held that no vacancy occurred where a term expired during the recess of the Senate, and the Governor appointed a person for the full subsequent term, and that the provisions of Article VII, Section 9, were not applicable. This statement was made, discussing Section 1, Article 2, Chapter 72, Acts of the Legislature, Regular Session, 1947, under which Brewster was appointed for a full term as a member of the State Board of Education: "* * * By the express language of Section 1 of the statute the Legislature expressed the intent that the word 'vacancy', as used in the statute, means the result of a fortuitous event occuring during the unexpired term of an office. * * * " The fortuitous event in this case was the refusal of the Senate to give its consent to the appointment of Hopson. By this action, the tenure of Hopson came to an abrupt end, and a vacancy was created in the office which he had theretofore filled.

Since there was a vacancy in the office of Director, as of March 15, 1955, the Governor could only appoint the relator under the provisions of Article VII, Section 9, of the Constitution, to fill the vacancy "until the next meeting of the Senate, * * * ." We construe his appointment as of that date "for the unexpired term ending June 30, 1957" to be a valid vacancy appointment only until the next meeting of the Senate.

The controlling question here presented, as to whether the relator has title to the office of Director, must be determined by a consideration of two constitutional provisions, Article VII of Section 9, heretofore quoted, and

Article VII, Section 7, which reads as follows: "The Governor may, on extraordinary occasions convene, at his own instance, the Legislature; but when so convened it shall enter upon no business except that stated in the proclamation by which it was called together." The meaning of the words "next meeting of the Senate" in Article VII, Section 9, and "no business" in Article VII, Section 7, have not heretofore been determined by this Court. There is some authority elsewhere, and, though not bound thereby, we have given it careful consideration.

The relator relies strongly upon the case of *State ex rel. Saint* v. *Dowling*, 167 La. 907, 120 So. 593, to support his contention that the words "next meeting" mean the next Regular Session of the Legislature, rather than the next Extraordinary Session of the Legislature. The Louisiana court said:

> "In fact, special sessions are of such exceptional character, and are so limited as to duration and as to objects of legislation, that they are not even included under the head of 'Legislative Department' in the present Constitution, but are placed under the head of 'Executive Department' and within the control of the Governor of the state.

> "At his discretion, the Governor may call a special session, set the date for its assembling, determine the length of its sitting, and designate the objects of legislation to be enacted. * * *

> "Under such conditions, it would be anomalous indeed if the chief executive of the state did not have the discretion to decide also whether recess appointments shall or shall not be confirmed by the Senate at a special session; especially as such session is convened on extraordinary occasions only, and is intended primarily for the enactment of emergency legislation, and not for action upon administrative matters. Besides, the appointive power is vested exclusively in the Governor of the

> state by its Constitution, and therefore it is left to him to take the initial step in having recess appointees confirmed by the Senate.

> "In its very nature, a special session is inappropriate for the confirmation of recess appointments."

However, that was a five to four decision, and the chief justice, in the dissenting opinion, stated: "* * * The language is that the authority of the Governor to make appointments during a recess of the Senate is limited to the 'granting of commissions which shall expire at the end of the next session.' The writers of the Constitution were well aware that 'the next session' of the Senate, after the making of recess appointments by the Governor, might be an extra session, as distinguished from a regular session; and, if the writers of the Constitution had intended to extend the authority of the Governor, in the making of recess appointments, so as to allow him to grant commissions which should not expire until the end of the next 'regular' session of the Senate, the writers of the Constitution would have written it so. * * * " The *Dowling* case was reaffirmed in *State ex rel. Saint* v. *Irion*, 169 La. 481, 125 So. 567, again by a divided court.

The comparable constitutional provisions of the State of Illinois are identical to those contained in our Constitution. While the supreme appellate court of that state has not had occasion to construe the words "next meeting of the Senate", the relator calls attention to the statement in the opinion of the Honorable John G. Fox, Attorney General of this State, prepared for the President of the Senate, to the effect that the Attorney General of the State of Illinois in an opinion had construed these words to mean "the next regular session of the Legislature".

In *McAffee* v. *Russell*, 29 Miss. 84, a statute provided that if a vacancy occurred in the office of Superintendent of the Penitentiary, by death, resignation, or refusal to act, "the vacancy shall be filled by the Governor until the

meeting of the Legislature." In the opinion, the court said :

> "The question arises here, whether reference was had exclusively to the biennial meeting of the legislature at the times stated by law, or to any session, regular or extraordinary, which might take place after a vacancy had occurred and was filled by the governor.

> "A literal construction of the language employed, clearly includes any meeting of the legislature, whether at an adjourned, called, or regular session. * * * "

The pertinent provisions of the Constitution of Nebraska, like that of Illinois, are very similar to ours. Likewise, the appellate court of Nebraska has not had occasion to pass upon those provisions, but the respondent cites an opinion of the Attorney General of Nebraska, dated August 28, 1946, which reads in part as follows: "It seems clear that the phrase 'the next meeting of the senate' must be construed to refer to special as well as to regular sessions of the Legislature, and that it was the intention of the framers of the Constitution and of the people who adopted it that interim appointments by the Governor to fill vacancies should be presented to the next meeting of the senate, whether or not such business was included in the Governor's proclamation calling the Legislature together. * * * "

In 42 Am. Jur., Public Officers, §113, it is stated that: " * * * confirmation by the senate of appointments made by the governor is not a legislative act. Consequently, such confirmation may be made as well at a special as at a regular session, and it is immaterial for what purpose the legislative body may have been called in session, for whenever that body is lawfully convened for legislative purposes, it has the right to act for administrative purposes, even without mention of such purposes in the call for a special session." These statements are taken from the opinion in the case of *State ex rel. Sikes* v. *Williams*, 222 Mo. 268, 121 S.W. 64.

The Constitution of the State of Florida, Section 8, Article IV, provides for the convening of the Legislature by the Governor by proclamation on extraordinary occasions for purposes stated in the proclamation, and that the Legislature when organized shall "transact no legislative business other than that for which it is especially convened."

In the case of *In Re Advisory Opinion*, 64 Fla. 16, 59 So. 782, it was held that the Senate, at an Extraordinary Session, could act upon gubernatorial appointments made while the Senate was in recess, and that it was the duty of the Governor to transmit to the Senate such nominations, since action thereon by the Senate was not "legislative business".

The Constitution of Missouri, Article IV, Section 55, provides that the General Assembly shall have no power to act upon "subjects" other than those specially designated in the proclamation by which the Senate is called.

In *State ex rel. Sikes* v. *Williams, supra,* it was held that when the Senate was lawfully convened "for legislative purposes it has the right to act for administrative purposes, even without mention of such purpose in the call for a special session. * * * "

Both the relator and respondent rely upon the contemporaneous and practical construction by the Governor and the Legislature, of the two constitutional provisions here under discussion. In *State* v. *Harden*, 62 W. Va. 313, 58 S. E. 715, the 5th Syllabus point reads: "A contemporaneous construction or interpretation, given to a constitution by the legislature, and acquiesced in by the people and the courts for a long period of time, will not be disturbed or overthrown, unless it be plainly wrong."

By the stipulation of facts, it is shown that since 1872 there have been thirty-two Extraordinary Sessions of the Legislature, each of which was called pursuant to Article VII, Section 7, of the Constitution. In only two was the subject of consideration of gubernatorial appointments

included, the Senate acted upon such appointments at fourteen Extraordinary Sessions, and did not act upon such appointments at five Extraordinary Sessions. At eleven of the Extraordinary Sessions, there were no gubernatorial appointments to be acted upon. It is obvious that there has been no uniform and consistent practical construction of these provisions. Furthermore, the doctrine of contemporaneous or practical construction is resorted to only where the language used in the instrument is doubtful, ambiguous, or uncertain. Sections 7 and 9 of Article VII, of the Constitution, are unambiguous and there is no conflict between them.

When the writers of the Constitution used the language "next meeting of the Senate" in Section 9 of Article VII, they must have been aware of the fact that there would be Extraordinary Sessions of the Legislature, since in Section 7, they had just given the Governor authority to call such sessions. If they had intended that the next meeting of the Senate would mean the next Regular Session of the Senate, they would have said so. The phrase "Regular Session" is freely used by the writers of the Constitution in Sections 6 and 18 of Article VII, and Sections 18, 22 and 24 of Article VI. Therefore, when they used the word "meeting" rather than "session", or "extraordinary session", it is clear, and this Court so holds, that they intended the next time the Senate was constitutionally convened. There is, of course, no authority given by Section 9 to confirm, or refuse to confirm, an appointee or nominee of the Governor, unless the Legislature has been convened in the manner provided by the Constitution. It is equally clear that the words "no business" in Section 7, Article VII, had reference to legislative business. In *State Road Commission of West Virginia* v. *West Virginia Bridge Commission, et al.,* 112 W. Va. 514, 166 S. E. 11, this Court, in referring to Section 7 of Article VII, said: "* * * The language of this section is without ambiguity, and its purpose to prevent enactments not germane to subjects stated in the call is too plain for controversy. * * * " The restriction refers to

matters of legislation, and, of course, the Senate can pass no legislation that is not concurred in by the House of Delegates. The Senate may, at an Extraordinary Session, conduct any administrative or executive functions granted to it by the Constitution, even though such is not mentioned in the proclamation convening the Legislature in Extraordinary Session. The words "no business", then, do not preclude the Senate from considering the recess appointments of the Governor at any time when the Legislature is constitutionally convened.

The Legislature has the authority, under Article IV, Section 8, to prescribe the manner in which all public officers and agents shall be elected, appointed and removed in cases not provided for in the Constitution. Pursuant to that authority, by Code, 29-5-1, the Bureau of Negro Welfare and Statistics was created, provision being made that it be in charge of a Director "to be appointed by the Governor, by and with the advice and consent of the Senate," to "hold office for four years unless sooner removed according to law." Under this constitutional provision, the Legislature had the authority to invest in the Governor the complete power of appointment, but it also had the authority to give one of the Houses of the Legislature, the Senate, some power regarding such appointments. It chose the latter course, and made it a condition of the appointment by the Governor that the Senate "consent" to it. When a vacancy occurred in this office during the recess of the Senate, the Governor had the authority under Section 9 of Article VII to appoint any "member of the Negro race" to fill the vacancy, but the appointment was valid only until "the next meeting of the Senate." It then became the Governor's mandatory duty, under the provisions of Section 9, to make a nomination. for such office, either of the person who had been appointed to serve until the next meeting of the Senate, or some other person. When the Governor failed to make such nomination at the next meeting of the Senate, which in this case was the Extraordinary Session, convening on the 9th day of May, 1955,

the Senate was denied the opportunity to give or withhold its consent to the nomination. The consent of the Senate to such nomination, under the provisions of Code, 29-5-1, was a prerequisite to the consummation of the appointment. Without that consent, the relator could have no title to the office during the remainder of the term to which Hopson had originally been appointed. The appointment under which the relator had been serving expired upon the adjournment of the Senate, and, thereafter, he had no title to the office of Director. Since May 13, 1955, when the Legislature adjourned the Extraordinary Session, the relator has had no title to this office, and, consequently, has no right to the salary of the office. The relator has no clear legal right to the relief sought herein, and, therefore, the writ must be denied.

*Writit denied.*