Scott M. MATHESON, as Governor of the State of Utah, Plaintiff and Respondent,

v.

Miles 'Cap' FERRY, President of the Utah State Senate, and Norman H. Bangerter, Speaker of the Utah State House of Representatives, et al., Defendants and Appellants.

No. 17961.

Supreme Court of Utah.

Jan. 11, 1982.

Melvin E. Leslie, R. Mont McDowell, Bruce E. Humberstone, David L. Wilkinson, Donald S. Coleman, Salt Lake City, for Senate, etc.

Bryce E. Roe, Salt Lake City, for Matheson.

BULLOCK, District Judge:

This is a class action for a declaratory judgment initiated by the Governor of Utah on July 1, 1981, against all members of the Utah Senate and House of Representatives, and 16 legislatively appointed members of Supreme and district court nominating commissions.

The Governor alleges that including legislative appointees on district and Supreme court nominating commissions and requiring the submission of his judicial appointees to the Senate for its advice and consent violate the separation of powers principle guaranteed by Article V, § 1 of the Utah Constitution. That Section provides as follows:

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

In a declaratory judgment dated August 25, 1981, the district court ruled that the portion of § 20–1–7.3[1] which provides for two members of district and Supreme court nominating commissions to be selected by the Legislature, and the portions of §§ 20–1–7.1[2] and 7.6,[3] and § 78–3a–8[4] which require Senate confirmation of Supreme, district, circuit and juvenile court appointments are unconstitutional.

Briefs have been submitted by the Governor, the Legislature, and the Attorney General. The basic positions urged upon the Court in those briefs are as follows:

## GOVERNOR

It is the position of the Governor that the appointment of judges is constitutionally an executive function and that the Legislature can participate in that function without violating the separation of powers principle embodied in Article V, § 1 only to the extent "expressly directed or permitted" by the Constitution. He contends that the Constitution does not expressly direct or permit legislative participation in the appointment process and, therefore, both legislative appointees on judicial nominating commissions and the statutory requirement of Senate confirmations of gubernatorial judicial appointments are unconstitutional.

## LEGISLATURE

The Legislature's position is that the process of selecting judges, including the selection of members of judicial nominating commissions, is not a power which should be properly characterized as executive, judicial or legislative, and therefore, separation of powers considerations should not be involved. However, if separation of powers principles are involved, the contention is that the process of selecting judges, including the appointment of judicial nominating commissions, is not a power or function "appertaining" exclusively to the executive department of government, and therefore, the Legislature may participate therein without violating Article V, § 1.

1. U.C.A., 1953, § 20–1–7.3(a) reads:
   Each judicial nominating commission shall have seven members: The chief justice of the Supreme Court, *one commissioner chosen by the senate, one commissioner chosen by the house of representatives,* two commissioners chosen by the governor and two commissioners chosen by the Utah State Bar Association.... [Disputed portion emphasized.]
   The juvenile court and circuit court nominating commissions do not include individuals selected by the Legislature. See U.C.A., 1953, § 78–3a–8 and § 20–1–7.3(3).

2. U.C.A., 1953, § 20–1–7.1, as amended in 1981, reads:
   Except as otherwise provided in this act, justices of the Supreme Court, judges of the district courts, and judges of the circuit court shall be selected, and a vacancy in any such office be filled, by appointment by the governor *with the advice and consent of the senate* of one of three persons nominated in the manner provided in this act by the appropriate judicial nominating commission for the office to be filled, but persons so appointed shall be subject to election by the voters at the time and in the manner provided in this act. [Amendatory language emphasized.]

3. U.C.A., 1953, § 20–1–7.6(4), as amended in 1981, reads:
   Subject to the appointee being *approved by the senate and being* retained in the office by the voters as provided in section 20–1–7.7, the person appointed pursuant to this section shall serve for the unexpired term of his predecessor in office or shall serve for the full term of office provided by law in case the appointment is to fill a vacancy in the office of a justice or judge whose term has expired or is to fill a vacancy created by the establishment of a new judicial office. [Amendatory language emphasized.]

4. U.C.A., 1953, § 78–3a–8(1), as amended in 1981, reads:
   When a vacancy occurs in the office of any judge of a juvenile court or upon the expiration of the term of any judge of a juvenile court, the governor shall appoint *with the advice and consent of the senate* a judge from a list of at least two candidates nominated by the juvenile court commission. Each candidate shall be a member of the Utah State Bar in good standing, shall be chosen without regard to political affiliation, and on the basis of ability, judicial temperament, and special aptitude for juvenile court work, taking into consideration his interest, understanding, and experience with respect to problems of family and child welfare, and with respect to the control of juvenile delinquency. The concurrence of at least three members of the commission shall be required to make nominations under this section. [Amendatory language emphasized.]

With respect to legislative power to confirm the Governor's judicial appointees, the contention is that it is a shared power, a fundamental part of our American system of checks and balances, and "may be exercised within reason by the Legislature pursuant to either express or implied provisions in the State Constitution."

## ATTORNEY GENERAL

The Attorney General takes the position that there is nothing in the Constitution which makes either the selection of nominating commission members or the selection of judges an executive function, and neither is it inherently so. Therefore, the Legislature can constitutionally participate in the process even to the extent of setting it up "to have been solely a legislative function, or it could have provided some means for selection not requiring executive, judicial or legislative involvement such as selection by Utah State Bar Commissioners with concurrence of the Senate." According to the brief, the appointment power of judges in Utah remains solely "up to the Legislature to determine."

It is the Attorney General's further contention that Senate confirmation is not part of the appointment process, and even if it were, as there is in the Utah Constitution no restriction placed upon the Legislature limiting or prohibiting it from exercising confirmation powers over judicial nominees, it has authority to so act. And it may so act without running afoul of any separation of powers mandate of Article V, § 1.

We think the constitutionally proper course is between the positions of the Governor and the Legislature and around the Attorney General to the end that by preserving a basic constitutional principle of separation of powers as mandated in Article V, § 1 and by an effective system of checks

and balances in the judicial selection process, the judicial department of government, when and by whoever selected, will remain independent and free of control by either of the other two in the exercise of its judicial functions.

■ Speaking first to the question of constitutionality of the nominating commissions, we hold that there is nothing in the Constitution or inherent in the separation of powers doctrine which prohibits the legislative department of government from involving itself in judicial appointment processes to the extent it has done under the nominating commission statute in question.

Even assuming the correctness of the Governor's contention that the selection and appointment of judges is inherently an executive function to the same extent as executive appointments to the executive department are executive functions,[5] it is still not so constitutionally executive under our Constitution so as to preclude participation by the legislative department in the appointment process in any degree. We think the executive power of appointment is best construed as a shared power and it is recognized as such in the majority of states.[6]

James Madison, in No. 48 of The Federalist, stated:

[U]nless these [three] departments be so far connected and blended as to give to each a constitutional control over the others, the degree of separation which [the separation of powers] requires, as essential to a free government, can never in practice be duly maintained.

Absent any specific language in the Constitution prohibiting the Legislature from participating in judicial selection and appointment procedures in any degree, it is our opinion that a statute providing for two

**5.** This position is supported by *In re Advisory Opinion to the Governor*, Fla., 276 So.2d 25 (1973).

**6.** "Although constitutional differences account for some variations in the decisions, a majority of jurisdictions do consider the appointive power not exclusively executive, or if executive not

exercisable exclusively by the governor." 1 Sutherland, Statutes and Statutory Construction § 3.20 (4th ed. D. Sands 1973). See also, *Taylor v. Lee*, 119 Utah 302, 226 P.2d 531 (1951); "The Theory of State Constitutions," Utah Law Review at 560 (1966); *Leek v. Theis*, 217 Kan. 784, 539 P.2d 304 (1975).

legislative appointees on a seven-member judicial nominating commission is constitutionally accommodated and does not necessarily violate Article V, § 1.[7]

■ With respect to the constitutionality of the statutes requiring Senate confirmation of judicial appointments, however, a control consideration is involved addressed in *Rampton v. Barlow*, 23 Utah 2d 383, 464 P.2d 378 (1970), persuading us that those statutes offend against the separation of powers doctrine in Article V, § 1.

In the *Barlow* case, we held that a statute permitting the Legislature to appoint six members to the State Board of Higher Education and the Senate to confirm the nine gubernatorially appointed members violated Article V, § 1. While the *Barlow* case may be distinguishable upon the grounds that the appointments involved were legislative appointments in the *executive* department,[8] and not the question of executive or legislative appointments in the *judicial* department, as in the matter before us, nevertheless the principles enunciated there are applicable here. That is to say, that the separation of powers doctrine will be violated where the legislative department of government exercises effective control over the function of selection and appointment of judges.

It is recognized that there is no specific language in the Constitution conferring power upon the executive to make judicial appointments.[9] On the other hand, the legislative department does have specific constitutional power to provide by law for the selection of Supreme Court and district court judges under Article VIII, § 3, and it presumably has the plenary power to do so with respect to juvenile and circuit court judges. *Wood v. Budge*, 13 Utah 2d 359, 374 P.2d 516 (1962).

The power to "provide by law," however, is not unlimited, and in our view such power is not only proscribed by the provisions of Article VIII, § 3 requiring Supreme Court and district court appointments to be based upon fitness for office contained in § 3 itself, but also by all other applicable provisions of the Constitution, including the separation of powers requirement of Article V, § 1. In other words, while the Legislature has the exclusive constitutional power to provide by law for the selection of judges, the law, which in its wisdom it so provides, must comport with and must not offend against other applicable provisions of the Constitution.[10]

The function of actually carrying out the judicial selection processes as provided by law and making appointments has historically been the function of the executive in this state, except when the selection has been made under an election procedure.[11]

7. According to a tabulation furnished by counsel, there are 26 states, including the District of Columbia and New York City, which use nominating commissions of varying compositions. Of these, only Alabama, Utah, and Vermont have legislative appointees thereon.

8. Cases cited by the Governor support the contention that the power to make appointments to positions *within* the executive branch itself is solely executive. *Springer v. Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928) (boards created to vote stock in governmentally created business); *Municipality of St. Thomas and St. John v. Gordon*, 78 F.Supp. 440 (D.Virgin Is.1948) (police commission); *Book v. State Office Building Commission*, 238 Ind. 120, 149 N.E.2d 273 (1958) (building commission); *State v. Hagemeister*, 161 Neb. 475, 73 N.W.2d 625 (1955) (school board); *People ex rel. Emerson v. Shawver*, 30 Wyo. 366, 222 P. 11 (1924) (state engineer); *State ex rel. v. DiSalle*, 172

Ohio St. 363, 176 N.E.2d 428 (1961) (state racing commission).

9. Article VII, § 10 does not apply because the appointment and/or election of judges is "otherwise provided for."

10. In addition to § 3, restrictions are imposed as to selecting Supreme Court and district court judges by various other sections of Article VIII of the Constitution with respect to age, active bar membership, residency, etc.

11. District and Supreme Court judges were elected on a partisan political basis from statehood until 1945 when the Constitution was amended to provide that their selection should be "based solely upon consideration of fitness for office without regard to partisan political considerations." During that time, vacancies were filled by gubernatorial appointment. From 1945 until 1967, they were elected by popular election on a nonpartisan basis, vacan-

Moreover, the function of applying the selection processes pursuant to laws which it passed and making actual appointments has never been performed by the Legislature itself. Indeed, so far as we are aware, the actual selection and appointment of judges in every state except two [12] (excluding states having popular election procedures) is done by the executive either by Constitution or statute, or both, under limitations and restrictions of varying degrees as the constitutions and laws in such states provide. Whether our Governor performs this function by constitutional power, statutory power, or by virtue of an inherent power born of practicality, history and tradition is not significant to our decision. What is important is the fact that such power when exercised by the Governor pursuant to law, whatever its source, is both protected and proscribed by Article V, § 1 of the Constitution. In our judgment, a contrary concept is an unacceptable dilution of the separation of powers doctrine and unnecessarily undermines a basic and fundamental principle of constitutional government.

The dissent of Justice Oaks is based upon a startling contention that there is no constitutional power in either the Governor or the Legislature to appoint judges. In our view, this is a pointless argument with respect to the real issue before us. It is not advanced by either the Governor or the Legislature, and an academic discussion of the proposition solves nothing. The fact of the matter is that judges have been selected and appointed by the Governor since statehood under laws passed by the Legislature and no party to this litigation is contending that such appointments have been or are now unconstitutional. See footnote 11.

The main question in the case is: given that the Governor makes judicial appointments pursuant to laws passed by the Legislature and given that such authority is not constitutionally absolute to the exclusion of the Legislature, is Article V, § 1 of the Constitution applicable to those laws? That question is answered by us in the affirmative and in the affirmative by the concurring opinions of both Justice Howe and Justice Stewart. The concept is sound because it strengthens rather than weakens the separation of powers principle, and it is compatible with every cited Utah case on the subject. It is simply the next logical step from *Rampton v. Barlow, supra.*

This Court stated in *Mulcahy v. Public Service Commission,* 101 Utah 245, 117 P.2d 298 (1941), in the context of reviewing the granting of a certificate of convenience and necessity:

> We are reviewing the action of an executive body, executing and carrying out the provisions of the law, the mandates of the statute, and ever since *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60, it has been recognized that one department of the government cannot control the judgment or official acts of another department acting within its proper sphere of governmental power, within the scope of its authority.

The second crucial question then is whether or not the legislative enactment requiring Senate confirmation of judicial appointments effectively controls the executive function in the selection processes or is merely a legitimate check and balance on an executive function.

By the interposition of nominating commissions, the Governor is limited in making his appointments to one of two or three candidates nominated by the commissions.[13]

---

cies again being filled by gubernatorial appointment. From 1967 until the present, they have been appointed by the Governor from names submitted to him by nominating commissions. U.C.A., 1953, § 20-1-7.1. Juvenile court judges have been appointed by the Governor under a nominating commissioner procedure since 1965. U.C.A., 1953, 78-3a-8. Likewise, circuit court judges have been appointed by the Governor from nominees of nominating commissions since the Circuit Court Act of 1977. U.C.A., 1953, 78-4-1 *et seq.*

12. In Virginia and South Carolina, supreme court justices are elected by the general assemblies. Va.Const., Art. VI, § 7; So. Carolina Const., Art. V, § 3.

13. As to Justices of the Supreme Court and judges of the district and circuit courts, the Governor's choice is limited to three nominees.

He cannot choose a person from a potentially broad field because the Legislature has created a commission which severely narrows his choice. Were that the extent of the limitation upon his appointive function as provided by law, the existence of the commissions would merely serve as legislatively imposed checks to prevent its abuse. The limitations would simply operate beforehand to narrow his appointment field. It is the addition of the "advice and consent" provisions which gives an offensive control of the power of appointment to the Legislature. By that addition, the Governor is limited both in his initial choice and by the power of veto of the Senate after the choice has been exercised by him. His discretion and power thus become severely curtailed to a point where his participation in the appointment process could become ineffective, subservient, and perfunctory, amounting to effective control by the Legislature found offensive to Article V, § 1 in *Barlow.*

Article VIII, § 3 of the Constitution reads as follows:

> Judges of the Supreme Court and district courts shall be selected for such terms and in such manner as shall be provided by law, provided, however, that selection shall be based solely upon consideration of fitness for office without regard to any partisan political considerations and free from influence of any person whomsoever, and provided further

that the method of electing such judges in effect when this amendment is adopted shall be followed until changed by law. (As amended November 7, 1944, effective January 1, 1945.)

From the above, with respect to Supreme Court and district court judges, it is made clear that partisan political considerations in the process of selection of judges are prohibited.[14] This provision is binding upon the nominating commissions, the Governor, and the Legislature. Presumably, by the time the nominating commissions consider candidates and nominate, and the Governor appoints from the nominees, the only function for the Legislature under a confirmation procedure would be to determine whether political or considerations other than fitness for office were in fact the basis for the nomination or appointment, or to second guess the nominating commissions and the Governor as to qualifications. In our opinion, a constitutional system of checks and balances does not extend that far either by constitutional requirement or necessity.[15]

We are not unmindful that as a matter of principle courts do not strike down a legislative act unless it is clearly in conflict with the higher law contained in the Constitution. It is with reluctance and respect for the Legislature that we must observe the irreconcilable conflict between the 1981 "advice and consent" amendments in the context of the judicial nominating commis-

See U.C.A., 1953, § 20–1–7.6(1)(a). With respect to juvenile court judges, the Governor appoints from "a list of at least two" nominees. See U.C.A., 1953, § 78–3a–8(1).

**14.** The Legislature has wisely provided that juvenile court judges be chosen "without regard to political affiliation, and on the basis of ability, judicial temperament, and special aptitude for juvenile court work." U.C.A., 1953, § 78–3a–8(1). Section 20–1–7.1 provides for the appointment of Justices of the Supreme Court, judges of the district courts, and judges of the circuit courts on the basis of fitness for office as determined by at least a majority of the members of the commission.

**15.** The appointees to the Supreme Court, district courts and circuit courts are subject to further checks by the electorate. They must go before the voters at the next general election

after appointment and periodically thereafter on the following question: "Shall (name of justice or judge) be retained in the office of (name of office, such as 'Justice of the Supreme Court of Utah' or 'Judge of the District Court of the Third Judicial District,' or 'Judge of the Circuit Court of the Fifth Circuit')? Yes ( ) No ( )." If a majority of the voters do not vote "Yes," the appointment process begins anew. The law also provides for a challenge by any "qualified member of the bar" on the occasion of any retention election. U.C.A., 1953, § 20–1–7.7.

Juvenile court judges do not stand a retention election, but are subject to renomination and reappointment by the Governor at expiration of the terms for which they are appointed. U.C.A., 1953, § 78–3a–8.

sions and the separation of powers provisions of our Constitution. We cannot, however, shirk our duty to find an act of the Legislature unconstitutional when it clearly appears that it conflicts with some provision of our Constitution. *Stanton v. Stanton*, 30 Utah 2d 315, 517 P.2d 1010 (1974); *Allen v. Rampton*, 23 Utah 2d 336, 463 P.2d 7 (1969).

In summary, we find no constitutional objection to the Legislature creating and participating in judicial nominating commissions to the degree it has by U.C.A., 1953, § 20–1–7.3(a). However, when Senate confirmation is added and further imposed upon the Governor, who must already nominate from a severely restricted list, such requirement becomes "control" as in *Rampton v. Barlow, supra,* and a violation of the separation of powers doctrine in Article V, § 1 of our Constitution.

Reversed in part and affirmed in part, consistent with the foregoing.

HALL, C. J., concurs.

HOWE, Justice (concurring):

I concur in the majority opinion. I agree that the creation of the nominating commission does not violate the separation of powers (Article V, § 1) but when coupled with the requirement of advice and consent by the senate, the legislature gains a control over the judiciary which is constitutionally offensive. That control is offensive not because the legislature has taken over an executive function, but because it intrudes upon the independence of another branch of government.

Article VIII, § 3, directs that "Judges of the Supreme Court and District Judges shall be selected for such terms and in such manner as shall be provided by law ..." That language does not except laws enacted thereunder from compliance with the other sections of the Constitution. Many other provisions of our Constitution likewise direct the legislature to write laws in other contexts. Unless it is expressly stated otherwise, the legislature in carrying out that constitutional direction must write those laws in harmony with every other section of our Constitution.

Article VIII, § 3, was amended to its present language in 1944 to provide for a nonpartisan judiciary, but there is nothing in that language which would support it doing so in a manner in exception to the separation of powers. Article VII, § 10, is an example of an exception under the separation of powers which is "expressly directed or permitted." Unlike Article VIII, § 3, its language specifically and expressly states that the Governor shall "nominate and with the advice and consent of the senate appoint" officers whose appointment or election has not been otherwise provided for. The function of nomination is given to the Governor exclusively and the function of appointment is given to him in connection with its shared exercise through the advice and consent of the senate. This is truly an example of an exception to the separation of powers.

Nor does Article VIII, § 3, provide any basis for concluding that the legislature could select the judges. The court in *State ex inf. Hadley v. Washburn*, 167 Mo. 680, 67 S.W. 592 (1902), interpreted a constitutional provision which directed an appointment not otherwise provided for to be made in "such manner as may be prescribed by law" as not permitting the legislature to actually make the appointment. There, at 67 S.W. 595, the court stated:

> That section expressly authorizes the general assembly, *acting within its legislative capacity, to pass a law* prescribing the manner in which an appointment shall be made, *but it does not authorize the general assembly to make the appointment itself,* nor to authorize anyone unconnected with the government to do so. To provide by law the manner in which an appointment shall be made is one thing, to make the appointment is another; the one is in its nature legislative, the other essentially executive. [Emphasis supplied.]

Having the power to write the law is not tantamount to having the power to execute the law after it has been enacted. As pre-

viously stated, our Constitution confers the power upon the legislature to write laws in many contexts. Article XV, § 2, for instance, directs the legislature to "provide by law for the organization, equipment and discipline of the militia . . ." No one would argue that the power to write the law on that subject gives the legislature the power to itself actually organize, equip and discipline the militia. The only power of the legislature in such examples is the power to enact the laws on that particular subject.

Since our Constitution is silent on the nature of the power of appointment of judges and this question has not confronted us before, we are left to our own interpretation of the nature of the power and the extent of infringement, if any, upon it. The crucial issue of this case, however, is not simply who the power of appointment belongs to—the legislature or the Governor. The issue is what effect there is upon the three-department structure of government because of the involvement in the power of appointment by the nominating commission and the senate. An understanding of the separation of powers doctrine is essential to this issues' resolution.

### SEPARATION OF POWERS

As the majority opinion observed, ". . . ever since *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60, it has been recognized that one department of government cannot control the judgment or official acts of another department . . ." *Mulcahy v. Public Service Commission,* 101 Utah 245, 117 P.2d 298 (1941). In *State v. Shumaker,* 200 Ind. 716, 721, 164 N.E. 408, 409, 63 A.L.R. 218, 221 (1928), the court spoke similarly:

> The true interpretation of this [separation of powers] is that any one department of government may not be controlled or even embarrassed by another department . . .

Justice Sutherland quoted Mr. Justice Story in *O'Donohue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933), "when he said that in reference to each other neither of the departments 'ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers.' "

The purpose behind the separation of powers is to preserve the independence of each of the branches of government so that no one branch becomes a depository for a concentration of governmental powers. Speaking of the purpose of the separation of powers doctrine in *Black v. Burch,* 226 Ind. 445, 459, 80 N.E.2d 294, 300 (1948), the court stated:

> Its object is basic and vital, namely to preclude a commingling of these essentially different powers of government in the same hands.

Were this case one where the particular power is inconsequential to the functioning of any of the branches but rests in one only because of tradition, then there would be no effect of imbalancing the government by either the legislative or executive branch exercising the power. But this is a different circumstance. The appointment of judges is not inconsequential. It is essential, not to the Governor or the legislature, but to a viable judiciary. Therefore a control, a direct or indirect influence of either of the other branches over the judiciary through the power of appointment, by itself or in conjunction with other powers, is coercive and undermines the independent functioning of the judiciary.

Frank E. Holman explained the danger in 1 Utah Law Rev. 21, 25 (1949):

> Without . . . a truly independent court, all the citizen's basic rights and freedoms would be mere high-sounding paper declarations of things to be hoped for, but always dependent upon the will of a particular President or Governor, or the particular legislative majority for the time being in power.

Suggested in the context of the need to restrain concentration of power in the judiciary, but also applicable to the need to preserve judicial independence, the court in *Searle v. Yensen,* 118 Neb. 835, 841, 226 N.W. 464, 466, 69 A.L.R. 257, 261 (1929), stated:

It [separation of powers] represents, probably, the most important principle of government declaring and guaranteeing the liberties of the people, and has been so considered, at least, since the famous declaration of Montesquieu that "there can be no liberty ... if the power of judging be not separated from the legislative and executive powers ..."

The irony of the separation of powers is that only by sharing powers to some extent is the independence of each of the branches preserved. In another context, quoting Bovier's Dictionary in *Tite v. State Tax Comm.*, 89 Utah 404 at 410, 57 P.2d 734, 737 (1951), this Court said, "There are many cases in which the duties of one department are to a certain extent devolved upon and shared by the other." At times the sharing of powers by two branches is a limitation upon the concentration of powers in either of them or in the third branch. Such a sharing does not violate but strengthens the separation of powers doctrine.

In the case of the power of appointment, the sharing of the power by the legislature and executive branches prevents exclusive control or influence by one or the other of the branches over the judiciary. The judiciary does not possess the power so that it may become too independent and tyrannical; and, neither other department exclusively controls the power so that it can coerce the judiciary. Only in this context of separation of powers does the significance of the power of appointment come to light.

### THE POWER OF APPOINTMENT

Since the constitutional silence on the nature of the power of appointment necessarily leaves this Court to its own interpretation of the nature of the power, we are not obliged, constitutionally or otherwise, to follow one line of authority over any other.

In an article on "The Governor's Constitutional Powers of Appointment and Removal", 2 Minn.L.Rev. 451 (March, 1938), J. M. Dawley discussed a split of authority which exists on the nature of the power of appointment and stated "There is no substantial agreement among the courts as to

its classification." He recognized one line of authority when he wrote: "There are, of course, many courts which have held that the power of appointment is not inherently executive ..." *Id.* at 452, 57 P.2d 734. Such courts believe that the power of appointment is an implied residual power in the legislature which rests there on a theory of popular sovereignty. That is the position of the dissenting opinion in the present case. As J. M. Dawley pointed out, "The result [of such a theory] is that the legislature can either *confer* the appointing power *whenever* it desires, or it can exercise that power itself." *Id.* at 453, 57 P.2d 734.

I believe that such a view ignores the significance of the separation of powers and delegates to the legislature an unhealthy and offensive control over the judiciary. This is so because under such a theory there is no effective limitation on the power of the legislature over the judiciary. It should be noted that the examples of legislative appointment of judges cited in the dissenting opinion, viz. Rhode Island, South Carolina and Virginia are all founded on an *express* provision of their state constitution which, of course, supersedes their separation of powers provision.

Perhaps because most states, unlike Utah, specifically and explicitly give the power of appointment of judges to their governors in their constitutions, the courts have not specifically held that governors have inherent powers to appoint judges. Still, many courts have recognized an inherent general power of appointment in the executive. The language of these cases does not appear to exempt the specific power of appointing judges from the general power of appointment. *Hadley v. Washburn*, supra, held the appointment of election commissioners to be an executive function based upon a separation of powers provision and the absence of an express constitutional classification of the power of appointment. *Young v. Brill*, 100 Minn. 499, 111 N.W. 294, 639 (1907), prohibited the legislature from requiring judges to appoint members of a board of control unrelated to the judiciary on a separation of powers theory grounded in the

presumption that the power of appointment generally is inherently executive. In *Application of O'Sullivan*, 117 Mont. 295, 301, 158 P.2d 306, 309, 161 A.L.R. 487, 491 (1945), the court stated, "Generally speaking, the power of appointment is an executive function [citation omitted] which cannot be delegated to the judiciary." The court in *In re Opinion of the Justices*, 302 Mass. 605, 620, 19 N.E.2d 807, 817 (1939), declared, "The power to appoint and the power to remove officers are in their nature executive powers. [Citation omitted]." *Yancey v. Hyde*, 121 Ind. 20, 22 N.E. 644 (1889), held that the legislature could not give itself or another branch the power of appointment since appointment of officers is an executive function. In *Daly v. Hemphill*, 411 Pa. 263, 274, 191 A.2d 835, 842 (1963), the court, using the separation of powers doctrine as a basis, concluded, "[T]he power of appointment is intrinsically and historically an executive function." The court in *In re Advisory Opinion to the Governor*, Fla., 276 So.2d 25, 29 (1973), went further and asserted, "The appointment of a judge is an executive function and the screening of applicants which results in the nomination of those qualified is also an executive function." See also 63 Am.Jur.2d, Public Officers and Employees, §§ 89, 90 (1972); *Municipality of St. Thomas & St. John v. Gordon*, 78 F.Supp. 440 (D.Virgin Islands 1948); *Tucker v. State*, 218 Ind. 614, 35 N.E.2d 270 (1941); *Taylor v. Commonwealth*, 26 Ky. 401, (3 JJ Marsh.) (1830); *Springer v. Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928); *Myers v. United States*, 272 U.S. 56, 47 S.Ct. 21, 71 L.Ed. 160 (1926); *Tolerton v. Gordon*, 236 Mo. 142, 139 S.W. 403 (1911).

J. M. Dawley in Minn.Law Rev., supra, also acknowledged this line of authority which finds that the power of appointment is executive. He explained:

... some courts hold that the appointing power is executive by nature ... where the courts have held the power of appointment to be inherently executive, there is no doubt about the legislature's inability to give itself the power. *Id.* 89 Utah at 452, 57 P.2d 734.

If forced to choose one of these two lines of authority over the other, I would favor the line which holds the power of appointment to be an inherently executive function. Under the Utah Constitution the Governor does not have the power to remove judges. The combination of exclusive appointment with removal therefore would not be his; and the danger of a concentration of power would not be as great as if he had both appointment and removal in his hands. However, since this is a case of first impression in our state, without precedent on point from elsewhere, this Court is not obliged to follow either or any particular authority in our interpretation. In Minn.Law Rev., supra, for instance, the author identified various viewpoints. Therefore, as the majority opinion of this Court has expressed, simply whose power the power of appointment is or from where it is derived is not crucial; the limitation of the power and the resulting balance of the government are important.

As the majority notices, the power of appointment typically has been shared in practice. The United States Constitution explicitly splits the power of appointment of judges between the President and the Senate; he chooses an appointee and the Senate accepts or rejects the choice. Also, the development of judicial nominating commissions in many states has made the power of appointment of judges a shared one. *State ex rel. Johnson v. Meyers*, 74 N.D. 678, 19 N.W.2d 745 (1945) held the power of appointment to be an "intrinsically but not exclusively executive function." There the court found a statute constitutional which allowed the Governor to share the power of appointment with a Commissioner of Insurance stating "An apportionment of that power between two executive officers cannot change the nature of the power. It remains intrinsically executive."

Even though it is more than an apportionment of power between two executive officers, the sharing of power of appointment of judges is not offensive to the separation of powers doctrine. Rather, it is a

protection against concentration of powers. The power to appoint judges involves a separate branch of government, the judiciary, and is not a power which is exclusively necessary to either the legislature's function of writing the laws or the Governor's function of enforcing the laws. In *Rampton v. Barlow*, 23 Utah 2d 383, 464 P.2d 378 (1970), where we held that a statute permitting the legislature to appoint six members to the State Board of Higher Education was a violation of separation of powers, the power of appointment was necessary to the executive function. The power was exclusive to the executive; and, the control of the function was, but should not have been, taken from one branch and placed in another. Consequently, this Court held such a usurpation to be unconstitutional.

This case is dissimilar to *Rampton*, supra, in that the violation is not the taking over by the legislature of an exclusive power of the Governor. The violation is more subtle. It is the taking over of the power of appointment of judges by the legislature to the effective exclusion of the Governor. It is a violation of separation of powers because the control the legislature possesses through its power of appointment upon the judiciary is without effective limitation by anyone. The result is a threat to the independence of the judiciary. The constitutional limitations such as merit and non-partisan requirements are of little comfort without an effective check upon the legislature.

The dissent suggests that these requirements prevent potential abuse and that any arbitrary overstepping of powers by the legislature is always subject to review by the courts. The difference between us is that I do not measure the constitutionality by the harm that will be suffered when an abuse occurs. At that point the separation of powers doctrine has failed in its purpose—to protect the people from abusive and tyrannical government. Instead, I measure the constitutionality (or lack of it in this case) by the imbalance created among the departments because of excessive control and potential for abuse by one department over another. At the same time, the argument that reviewability of abuse by the courts forestalls potential abuse seems circular where the potential abuse is control of the judiciary.

This case is similar to *Rampton*, supra, in that both cases recognize that the key element in determining a violation of separation of powers is control. Neither the creation of the nominating commission nor the composition of the commission as it presently exists gives the legislature an influence or control over the judiciary that offends the Constitution. The commission narrows the Governor's option of appointees from a broad field to only a choice of two or three. Because the Governor is left with the final choice, however, the imposition of the nominating commission merely operates as a check before the choice rather than as a veto afterward, in order to limit the Governor's control over the judiciary.

However, the addition of the veto in the form of the senate's "advice and consent" severely curtails his participation in the process. As the trial court correctly observed, the Governor's limited choice from a field of three can lawfully be vetoed by the Senate until the one of the three which is its preference becomes the appointee. The appointment then becomes the Senate's. Contrary to the statement made in footnote nine in the dissenting opinion, there is no "clear inference" that the Governor is entitled to make his second nomination from a new list of three nominees. There is no statutory authorization for the nominating commission which has completed its work to again meet and produce a new list. It is not our function to legislate and gratuitously devise a way for reconvening the commission. See Article VII, § 8, of the Montana Constitution and Mont.Rev.Codes Ann., § 3–1–1013, where the procedure of reconvening the commission is both constitutionally and statutorily provided for. See also, *Stanton v. Stanton*, 30 Utah 2d 315, 517 P.2d 1010 (1974), where we held that courts should defer to the legislature to make laws and confine ourselves to interpreting them.

This legislative control is even more offensive when it is considered that the legislature was granted in our Constitution in Article VIII, § 11, the power to remove judges from office, in Article VI, § 19, the power of impeachment, and in Article VIII, § 2, the power to determine the number of judges. The extent of judicial review of its acts, if any, is extremely limited.

Not only is the legislature's potential control constitutionally offensive, but an appointment by the Senate offends Article VIII, § 3, which, as I have heretofore observed in this opinion, gives the legislature only the power to write the law providing for the selection of judges, not the power to itself select them.

In summary, the legislature exercises control in that it 1) imposes the nominating commission, 2) participates on the nominating commission, 3) dictates the constitution of the commission membership, 4) restricts the Governor's choice of an appointee to one from a field of three, and 5) gives the Governor no opportunity to reject all nominees. Further, the legislature also exercises control through its powers of 6) removal for cause, 7) impeachment, and 8) determination of the number of judges. In this context the addition of the confirmation power in the appointment process is an excessive sharing which constitutes legislative control that violates the separation of powers.

Therefore, like the majority, it is with a recognition of the presumption that laws are not to be stricken if they can reasonably be upheld that I must find the "advice and consent" statute unconstitutional. Because

of my respect for the legislature I join my brethren with some reluctance. However, the preservation of the separation of powers and the independence of the judiciary compel me to do so.

STEWART, Justice (concurring and dissenting):

I concur in the judgment that Senate confirmation of gubernatorial appointees to the offices of Justice of the Supreme Court and judges of the district and circuit courts is unconstitutional under the present method of selecting judges. Because I reach that conclusion on somewhat different grounds from those essayed by Judge Bullock and Justice Howe, I shall set forth the reasons for my conclusion. I think the conclusion unavoidable that senatorial confirmation of those judges named above, as provided in U.C.A., 1953, § 20–1–7.1,[1] § 20–1–7.6(4),[2] when those judges must also stand an election subject to contest, is in violation of Article VIII, § 3 and Article V, as amplified by Article VII, § 10 of the Utah Constitution which specifies when the Senate may confirm appointees. I agree that senatorial confirmation of juvenile court judges, who do not stand election, is constitutional. In brief, senatorial confirmation under the Utah Constitution is part of the appointment power, and under the constitutional provisions may be exercised only as prescribed by the Constitution. Specifically, senatorial confirmation is not permissible when an appointee for office— whether judicial, executive or legislative— must stand an election subject to contest to remain in office.

1. U.C.A., 1953, 20–1–7.1 provides:

Except as otherwise provided in this act, justices of the Supreme Court, judges of the district courts, and judges of the circuit court shall be selected, and a vacancy in any such office be filled, by appointment by the governor *with the advice and consent of the senate* of one of three persons nominated in the manner provided in this act by the appropriate judicial nominating commission for the office to be filled, but persons so appointed shall be subject to election by the voters at the time and in the manner provided in this act.

2. U.C.A., 1953, 20–1–7.6(4) provides:

(4) Subject to the appointee being *approved by the senate and being* retained in the office by the voters as provided in section 20–1–7.7, the person appointed pursuant to this section shall serve for the unexpired term of his predecessor in office or shall serve for the full term of office provided by law in case the appointment is to fill a vacancy in the office of a justice or judge whose term has expired or is to fill a vacancy created by the establishment of a new judicial office.

I also dissent from the holding that judicial selection committees are constitutional. In my view the issue is moot and nonjusticiable.

## I.

In 1944 the people of Utah voted to amend the Constitution to dispense with the dubious practice which had existed from Statehood of selecting judges by partisan elections. Prior thereto and for a time after that, judges ran for election on a partisan ticket, as Republicans or Democrats, and generally were voted into and out of office as their political parties succeeded or failed. Merit selection, as an official, specifically designed policy to enlist the most competent candidates, was a stranger to the process. Partisan elections were not designed to promote judicial competence, impartiality, and dedication to the rule of law without regard to outside pressures. The amendment became effective in 1945. The 1945 amendment provided that the method for selecting judges was to be determined by the Legislature. As amended, Article VIII, § 3 now provides:

> Judges of the Supreme Court and district courts shall be selected for such terms and *in such manner as shall be provided by law*, provided, however that selection shall be based solely upon consideration of fitness for office without regard to any partisan political considerations and free from influence of any person whomsoever, and provided further that the method of electing such judges in effect when this amendment is adopted shall be followed until changed by law. [Emphasis added.]

The initial issue to be addressed is the meaning of the term "in such manner as shall be provided by law ..." That term was clearly intended to give the Legislature some latitude in devising the manner in which judges should be selected. For example, judges could be selected by gubernatorial appointment, some type of election, or perhaps in some other way. In this case, however, we are concerned only with determining whether the term, "as shall be provided by law ...," authorized the Legislature to require Senate confirmation.

## II.

The inherent and preeminent function of the legislative branch of government is to enact laws of general applicability, to provide normative standards of conduct for society and to provide for the organization and operation of the government. As the United States Supreme Court stated in *Springer v. Philippine Islands,* 277 U.S. 189, 190, 48 S.Ct. 480, 72 L.Ed. 845 (1928): "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement." (Quoted with approval in *Rampton v. Barlow,* 23 Utah 2d 383, 388, 464 P.2d 378, 381 (1970).) Although the Legislature under our constitutional scheme possesses all lawmaking power not denied it by the Utah or the United States Constitutions, *State ex rel. Stain v. Christensen,* 84 Utah 185, 35 P.2d 775 (1934); *State ex rel. Nichols v. Cherry,* 22 Utah 1, 60 P. 1103 (1900), it does not possess all the powers of government. It is only "Legislative power" which has been conferred upon the Legislature by the legislative article of the Constitution, Article VI, § 1, not executive [3] or judicial power, with minor exceptions referred to hereafter. In addition, the Constitution confers certain other powers on the Legislature in implementation of the constitutional system of "checks and balances." Such powers are not *legislative* powers in their nature, but powers that are either executive or judicial. Generally, they are not exercised in the same manner

---

3. Article VII, § 5 was amended in 1980 to explicitly confer the full executive power of the State on the Governor. That provision now states in pertinent part:

> The executive power of the State shall be vested in the Governor, who shall see that the laws are faithfully executed. The Governor shall transact all executive business with the officers of the government, civil and military ...

as are legislative powers. The legislative power, the power to make laws, can only be exercised by the joint action of both chambers in the manner prescribed by the Constitution, but not by one chamber acting alone. *In re Opinion of the Justices*, 303 Mass. 615, 21 N.E.2d 551 (1939); *Walker v. Baker*, 145 Tex. 121, 196 S.W.2d 324 (1946).

The Constitution specifically restricts the exercise of legislative power in numerous ways by specific prohibitions. E.g., Article VI, § 26, 27, 28, and 29. That power is also limited by the nature of the power itself. In an early case, the Supreme Court of Ohio, in *Attorney General v. Kennon*, 7 Ohio St. 546, 560–561 (1857), held that the very nature of legislative power does not encompass the appointive power:

> To prescribe the *manner* of election or appointment to an office is an ordinary legislative function. To make an appointment to office is an administrative function. And under a constitution in which the philosophical theory of a division of the powers of government into legislative, executive, and judicial, should be exactly carried out in detail, the power of prescribing the *manner* of making appointments to office would fall naturally and properly to the legislative department; while the power to make the appointments themselves would fall as naturally and properly to the executive department. This exact adherence to theory, however, is seldom if ever found in any frame of government; and we refer to the distinction simply by way of reply to the claim, on behalf of defendants, in argument, that the power to prescribe the *manner* of appointments includes the power of appointment itself, and to show that they are acts and powers wholly different and distinct from each other.

And, in a concurring opinion, Swan, J., stated:

> Upon this question, it seems to me only necessary to refer to the plain words of the constitution. It provides, in the first place, that "the election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by this constitution or the constitution of the United States, *shall be made in such manner as may be directed by law.*" Now, providing by law the manner in which an appointment shall be made, and making the appointment itself, are two different things: the first is pointing out the mode in which a thing shall be done, and the other is doing the thing itself; the one is legislative and directory, the other administrative. [Emphasis added.] *Id.* at 570.

Accord: *Municipality of St. Thomas & St. John v. Gordon*, 78 F.Supp. 440 (D.C.V.I. 1948); *Handley v. Washburn*, 167 Mo. 680, 67 S.W. 592 (1902); *State ex rel. University of Minnesota v. Chase*, 175 Minn. 259, 220 N.W. 951 (1928). The principle laid down in these cases, that the legislative power may define the manner of selection for an office, but may not make the actual appointment, is an essential part of the doctrine of separation of powers. *Municipality of St. Thomas & St. John v. Gordon, supra; State ex rel. University of Minnesota v. Chase, supra; Walker v. Baker*, 145 Tex. 121, 196 S.W.2d 324 (1946); cf. *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926).[4] Moreover, unless the Constitution specifically provides otherwise, the legislative power to determine the manner of selection does not include the power of legislative or senatorial confirmation. The courts have been "unanimous in their holding that *confirmation is not a distinct legislative power*, but rather a part of the executive power of appointment which has in turn been delegated in some specific instances by constitution to the legislative branch." *Bradner v. Hammond*, Alaska, 553 P.2d 1, 7 (1976). Accord: *Myers v. United States*, 272 U.S. 56, 138–39, 47 S.Ct. 32 (1926); *State v. Hagemeister*, 161 Neb. 475, 73 N.W.2d 625 (1955); *Wittler v.*

---

4. To maintain the doctrine of separation of powers, it is necessary, of course, that the Legislature have the power to appoint its own clerks, assistants, and professional staff, see Article VI, § 32. The independence of the Legislature is of no less importance than that of the other two branches of government.

*Baumgartner*, 180 Neb. 446, 144 N.W.2d 62, 67 (1966); *Walker v. Baker*, 145 Tex. 121, 196 S.W.2d 324 (1946); *State v. Dowling*, 167 La. 907, 120 So. 593 (1928); *People v. Shawver*, 30 Wyo. 366, 222 P. 11 (1924). 81A C.J.S. States § 84 (1977).

Therefore, the phrase in Article VIII, § 3, "in such manner as shall be provided by law," only permits the legislative power to be used to determine the *manner* of selection and the manner of selection does not include confirmation, unless the Constitution in some other specific provision confers that power.

Despite its breadth, it is clear beyond peradventure that the language in Article VIII, § 3 does not confer on the Legislature plenary power over the appointment of judges. Indeed, if that provision were so construed, it would have to be conceded that the Legislature could itself appoint judges under virtually any conditions it chose to impose, a practice that could have the most profound and far-reaching effects for constitutional government.[5] Such a power would enable the Legislature to assert dominance over the Judiciary and effectively destroy it as an independent branch of government. With a Judiciary

5. Although the doctrine of separation of powers has not been rigorously adhered to in some states, its importance as a fundamental principle of constitutional law has been generally recognized, at least as to the three great departments of government at the state and federal levels, with the exception of administrative agencies.

The great French philosopher, Montesquieu, stated what is still recognized as a valid principle:

Again, there is no liberty, if the judiciary power be not separated from the the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined the executive power, the judge might behave with violence and oppression. *The Spirit of Laws*, p. 70. [Great Books, Vol. 38 (1952)]

Montesquieu's writings were familiar to the founders of the United States Constitution. Madison stated:

If there is a principle in our Constitution, indeed in any free Constitution more sacred than another, it is that which separates the legislative, executive and judicial powers. (1 Annals of Congress, 581.)

As first ratified, the United States Constitution did not have a Bill of Rights because of the belief that in the structure of government itself there was sufficient protection against any form of despotism. The doctrines of separation of powers and delegation of powers were initially deemed sufficient to provide the necessary protection against the age-old tendency of government to eventually assume despotic powers. As Madison wrote in the *Federalist*, No. 48, p. 197. [Great Books, Vol. 43 (1952)] "It will not be denied that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it." For that reason, he stated:

It is agreed on all sides, that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident, that none of them ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers. *Id.*

In arguing for the protections afforded individuals by separation of powers, Madison noted the numerous violations of that doctrine among the various states at that time. For example, he criticized the structure of government in Virginia which authorized the Legislature to fill all the principal offices, both executive and judicial. He also observed that the Constitution of North Carolina and South Carolina also provided for the legislative power of appointment of members of the judiciary as well as of executive officers, and in the case of South Carolina, *even the power of appointment of officers in the executive department down to captains in the army and the navy.*

Madison made clear that he did not wish to be "regarded as an advocate for the particular organisations of the several State governments." Indeed, he though the constitutions of the first states bore "strong marks of the haste" with which they were created, and still "stronger" marks of the inexperience under which they were framed. In reference to the states, Madison stated:

It is but too obvious that in some instances the fundamental principle under consideration has been violated by too great a mixture, and even an actual consolidation of the different powers; and that in no instance has a competent provision been made for maintaining in practice the separation delineated on paper. What I have wished to evince is, that the charge brought against the proposed Constitution, of violating the sacred maxim of free government, is warranted neither by the real meaning annexed that maxim by its author, nor by the sense in which it has hitherto been understood in America. *Federalist*, No. 47, p. 156. *Id.*

subservient to the Legislature, the Executive Branch would also eventually experience erosion of its independence, and it would be virtually certain that judicial review—the doctrine which has given critical vitality and efficacy to constitutional government limited by a written constitution—would be destroyed.

Thus, the most basic framework of our constitutional scheme would be subject to revolutionary change by legislative enactment alone. Yet, it has been strenuously argued that Article VIII, § 3 is not restricted by the separation of powers principle and even that the Legislature itself could make judicial appointments. Even the dissent concedes that serious constitutional problems would arise in such a case. If the spectre raised seems extreme, it must, nonetheless, cause one to pause. For, as Mr. Justice Frankfurter stated in his concurring opinion in *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 594, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952):

The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.

The dissent espouses a theory of separation of powers that would accommodate a substantial intermingling of powers. How much, it is not possible to determine because no effort is made to lay down a standard that distinguishes that which is too much and unconstitutional from that which is not too much and constitutional. Indeed, the principle espoused is so flexible as to admit of no definition. As stated in the dissent: "The principle of separation of powers should therefore be viewed not only in terms of the functional independence of each branch of government, but also in terms of the inevitable and desirable interdependence of each of the three branches, which serves the same purpose." On that view separation of powers is made to turn on a subjective determination of what is and is not constitutional. That concept does not serve as a principled guide for

decision making. Certainly no rationale is advanced which justifies expanding legislative power to include the power of confirmation or even appointment—such as was prohibited in *Rampton v. Barlow, supra* —but which would stop short intrusion in other powers belonging to the other departments.

### III.

In my view the Utah Constitution requires adherence to that view of the doctrine of separation of powers stated by Mr. Justice Brandeis in his dissent in *Myers v. United States,* 272 U.S. 52, 293, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926):

The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.

The doctrine of separation of powers was explicitly made a part of the Constitution of Utah, to assure that each department would be independent within its own sphere but without the power to dominate another department. Unlike the Federal Constitution, that principle is not left to be deduced from the general structure of the Constitution. Article V, § 1 of the Utah Constitution states:

The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, *except in the cases herein expressly directed or permitted.* [Emphasis added.]

The framers of the Constitution considered the principle embodied in Article V, § 1 to be of such importance that they wrote that provision to prevent its erosion by implication, strained constructions, or any means which would have the effect of

690

enfeebling that great, overarching principle of constitutional government. Exceptions to the general principle were to be permitted only in cases "expressly directed or permitted" by the Constitution itself, and generally for the purpose of creating checks and balances as between the departments of government.

Several examples are found in the Constitution of express provisions which intermingle some of the great powers of government to temper and restrain the powers of each of the departments. For example, the House and the Senate may exercise judicial power in the form of impeachment proceedings, Article VI, §§ 17, 18; and the Senate may exercise a part of the executive power in participating in the appointive process by consenting or refusing consent to gubernatorial appointments, Article VII, § 10. The Governor is authorized to exercise a legislative power by being invested with the power to veto legislative enactments, Article VII, § 8; to convene extra sessions of the Legislature, Article VII, § 6; and to adjourn the Legislature in case of disagreement between the two houses of the Legislature at any special session, Article VII, § 7. In each case, the exceptions to the doctrine of separation of power are explicitly stated and designed for a particular purpose.

It has been argued that the phrase in Article VIII, § 3, "as provided by law" was intended to permit the Legislature to act without regard for the limitations established by Article V. There is no valid basis in reason or law for such a revolutionary construction. Indeed, the term "as provided by law" is found in numerous places throughout the Constitution, and if that phrase could be interpreted to empower the Legislature to override the separation of powers doctrine with respect to the Judiciary, that doctrine could itself be utterly destroyed, the basic nature of constitutional government completely altered, and the liberties of the people subverted to the extent they depend on separation of powers. For example, the Legislature which has constitutional power to "provide by law" the duties of various state officials, could, if the

construction asserted were correct, authorize the Lieutenant Governor or Attorney General to enact laws or the State Auditor or Treasurer to perform judicial functions. See Article VII, §§ 14, 15, 16. It strains credulity past all reason to maintain that the electorate in adopting the present version of Article VIII, § 3 ever intended such a radical, if not revolutionary, destruction of a fundamental precept of government in this State. When the separation of powers doctrine is to be overriden, specific language sufficient to that end was employed in the Constitution in the emergency powers provision. See Article VI, § 30.

It is clear that Article VII, § 3 empowers the Legislature to authorize the Governor to make judicial appointments. That section is the source of the Governor's power, but it is not the case that the position of this opinion rests on the proposition that the executive "has inherent power to select judges," notwithstanding Article VIII, § 3. Nevertheless, the power granted the Legislature is confined within its own limitations and the limitations of the doctrine of separation of powers. The dissent rejects "the idea that the power to select judges is an executive power" in the constitutional sense. That may be. However, although the Legislature might conceivably have selected another means, it authorized the Governor to make appointments, just as it has done in myriad other cases. Having done so, it cannot then go beyond what is "authorized by law."

The key question then is, does the Constitution authorize the Senate to confirm? If not, the Senate may not. To the extent that the Constitution deals generally with the power of appointment, it is dealt with exclusively in the Executive Article, Article VII. Section 9 of that Article vests in the Governor the power to fill a vacancy in any State or district office which becomes vacant when there is no mode provided either by the Constitution or the laws for filling such vacancy. The appointment or commission extends until the next election and qualification of the person elected to such office.

Section 10 authorizes one of the most important of the checks and balances, senatorial confirmation, under certain circumstances. It vests in the Governor the power to nominate "all State and district officers whose offices are established by this Constitution, or which may be created by law ..." and in the Senate the power to consent to nominations *if the officer is not subject to election or his appointment in some other manner* than by the Governor. That section states:

The Governor shall nominate, and by and with consent of the Senate, appoint all State and district officers whose offices are established by this Constitution, or which may be created by law, *and whose appointment or election is not otherwise provided for.* If, during the recess of the Senate, a vacancy occurs in any State or district office, the Governor shall appoint some qualified person to discharge the duties thereof until the next meeting of the Senate, when the Governor shall nominate some person to fill such office. If the office of Lieutenant Governor, State Auditor, State Treasurer or Attorney General be vacated by death, resignation or otherwise, it shall be the duty of the Governor to fill the same by appointment, from the same political party of the removed person; and the appointee shall hold office until a successor shall be elected and qualified, as provided by law. [Emphasis added.]

**6.** The Constitution contemplates that the Governor will fill most major non-elective state offices by appointment. Thus, major executive department offices as well as many commission and agency offices are generally appointed by the Governor with the consent of the Senate. But when the Legislature authorizes a manner of appointment other than by the Governor, whether by civil service or by other agencies such as certain boards or commissions, Senate confirmation is not appropriate.

**7.** It was the view of Alexander Hamilton that the appointive power exercised by government was inherently executive in nature except to the extent that the legislative and judicial branches appointed their own employees and agents. In *Federalist* No. 76, p. 225–6 [Great Books, Vol. 43 (1952)], Hamilton stated:

Those who have themselves reflected upon the subject, or who have attended to the observations made in other parts of these

As stated in Part II, the power of confirmation conferred on the Senate by § 10 is not an exercise of legislative power; it is an aspect of *the appointive power. Harman v. Harwood,* 58 Md. 1 (1881); *Walker v. Baker,* 145 Tex. 121, 196 S.W.2d 324 (1946). Indeed, the Legislature, which is the only body that can exercise legislative power, does not perform the act of consenting or not consenting to a gubernatorial appointment; only one chamber of the Legislature acts, and that is not an act of the Legislature under our Constitution. Accord, *Chadha v. Immigration and Naturalization Service,* 634 F.2d 408 (9th cir. 1980); *In Re Opinion of the Justices,* 303 Mass. 615, 21 N.E.2d 551 (1939); *Walker v. Baker, supra.* The power of the Senate to give advice and consent under Article VII, § 10 is a part of the appointment power conferred on the Governor by that provision.[6] *Harman v. Harwood, supra; Walker v. Baker, supra. Cf., State v. Di Salle,* 172 Ohio St. 363, 176 N.E.2d 428 (1961); *State v. Kennon,* 7 Ohio St. 546 (1858).

The power of selection under § 10 may be exercised directly by the people in the form of an election, if required by the Constitution or statutes, or by appointment by the Governor, with the consent of the Senate, depending upon whether the appointee must stand election, and possibly in other ways.[7]

papers in relation to the appointment of the President, will, I presume, agree to the position, that there would always be great probability of having the place supplied by a man of abilities, at least respectable. Premising this, I proceed to lay it down as a rule that one man of discernment is better fitted to analyse and estimate the peculiar qualities adapted to particular offices than a body of men of equal or perhaps even of superior discernment.

The sole and undivided responsibility of one man will naturally beget a livelier sense of duty and a more exact regard to reputation. He will, on this account, feel himself under stronger obligations, and more interested to investigate with care the qualities requisite to the stations to be filled, and to prefer with impartiality the persons who may have the fairest pretensions to them. He will have *fewer* personal attachments to gratify than a body of men who may each be sup-

The purpose of Article VII, § 10 is to provide a check on the appointment power of the Governor in one of two ways: either by senatorial confirmation or by election, if that follows appointment, but not both. A requirement of both confirmation and an election subject to contest would be, at best, a redundancy; and senatorial denial of a Governor's appointment would deny the people the right to vote on the Governor's first choice. This construction of Article VII, § 10 is not only required by the explicit language of that provision, but it is also consistent with the proposition that the power of senatorial consent should be narrowly construed. *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). The construction is also consistent with the policy underlying the language in § 10 that the Governor shall fill unexpired vacancies in the major elective State offices, i.e., Lieutenant Governor, State Auditor, State Treasurer, and Attorney General without

senatorial confirmation. In such cases, the sole restriction upon the power of the Governor in making the appointment is that the appointee must be from the same party as the party of the person who previously held that office.[8]

That a short period will elapse between the time a judge is appointed and the time he must stand election under the present system is of no consequence. The plain fact is that a judge must stand election. *Monson v. Hall*, Utah, 584 P.2d 833 (1978). The same is also true of other officials who may be appointed subject to later standing election. Exercising the powers of office for the short interim period does not call for confirmation.

In sum, the Governor has power to appoint judges pursuant to legislation which expressly confers that power and which was enacted pursuant to Article VIII, § 3. However, because of the intrinsic nature of

posed to have an equal number; and will be so much the less liable to be misled by the sentiments of friendship and of affection. A single well-directed man, by a single understanding, cannot be distracted and warped by that diversity of views, feelings, and interests which frequently distract and warp the resolutions of a collective body. There is nothing so apt to agitate the passions of mankind as personal considerations, whether they relate to ourselves or to others, who are to be the objects of our choice or preference. Hence, in every exercise of the power of appointing to offices by an assembly of men, we must expect to see a full display of all the private and party likings and dislikes, partialities and antipathies, attachments and animosities, which are felt by those who compose the assembly. The choice which may at any time happen to be made under such circumstances will of course be the result either of a victory gained by one party over the other or of a compromise between the parties. In either case, the intrinsic merit of the candidate will be too often out of sight. In the first, the qualifications best adapted to uniting the suffrages of the party will be more considered than those which fit the person for the station. In the last, the coalition will commonly turn upon some interested equivalent: "Give us the man we wish for this office, and you shall have the one you wish for that." This will be the usual condition of the bargain. And it will rarely happen that the advancement of the public service will be

the primary object either of party victories or of party negotiations.

8. The contention in the dissent that the Governor would have no power to appoint judges if § 10 is read as I read it, is without merit. Section 10 depends in many, if not most cases, upon statutes conferring appointment power on the Governor and the power of confirmation on the Senate. For the most part, § 10 is not self-executing. *Thus, appointments are made by the Governor and confirmed by the Senate pursuant to statutes enacted under the authority of Article VII, § 10.* The dissent asserts that § 10 is not applicable—as do I—but contends that if Senate confirmation under that section is impermissible then so is gubernatorial appointment. The baffling argument is then made that recognition of the power of the Governor to make judicial appointments is evidence of adherence by this opinion to the proposition that there is an inherent executive power to appoint. The dissent's argument simply fails to accept the fact that this opinion has consistently stated that the Governor's power to appoint judges is derived from statutory authority enacted pursuant to Article VIII, § 3 and not pursuant to a self-executing power under Article VII, § 10. Therefore, even if it be assumed that there is no gubernatorial power to appoint under § 10, there is nevertheless power to appoint pursuant to statutory authority enacted pursuant to Article VIII, § 10. The implied concept in the argument of the dissent that there is only one source of appointment power in the Constitution is novel.

legislative power itself, Article VIII, § 3 does not give the Legislature the power to authorize Senate confirmation of a state official. The authority for Senate confirmation can only be found, if it exists at all, in the Constitution. Such authority does not exist in this case as to Supreme Court justices, district court and circuit court judges, because under § 10 their election is otherwise provided for.[9] The dissent and plurality opinion agree that § 10 does not apply—on that there is agreement, although for different reasons. As to juvenile court judges, confirmation is required because they do not stand election.

To contend, as does the dissent, that § 10 is a "backup measure designed to prevent the dilemma of a legally authorized office without a legally prescribed method for filling it," is to misperceive the highly important nature and purpose of § 10. That construction relegates that section to a constitutional redundancy as a "backup" measure for a situation that is covered by Article VII, § 9. The relationship between the branches of government intended by the framers of the Constitution would be seriously disjointed if that construction of § 10 were to prevail.

The practice in the State follows the pattern laid out in § 10. The Department of Social Services is one example. The chief administrative officer of the department is the executive director who is appointed by the Governor with the advice and consent of the Senate. U.C.A., 1953, § 63–35–5. Various division directors are appointed by a board having direction of the particular division, with the concurrence of the executive director of social services. Section 63–35–6. The members of the various boards are appointed by the Governor with the advice and consent of the Senate. See, for example, Section 63–36–1. Thus, the Governor's appointments, who hold major positions of responsibility are subject to Senate confirmation.

Where does the Legislature obtain the power to require the Senate confirmation of the executive director? From § 10. He is appointed by the Governor, and he does not stand election. Those of lesser rank and authority, the division directors, are not confirmed because they are not appointed by the Governor. Numerous other examples of the same general procedure are found throughout the statutes relating to a host of governmental departments and agencies.

If Justice Oaks' interpretation of § 10 were correct, the result would be a wholesale shift of power from the Legislative Branch to the Executive Branch. The immediate consequence of the dissent's conclusion that § 10 is a minor, "back-up" provision is to shatter the constitutional foundation for senatorial confirmation of the literally hundreds of gubernatorial appointments which now are subject to confirmation, and to destroy a firmly rooted principle of constitutional government in Utah.

## IV.

The issue of the constitutionality of the judicial nominating commissions is, in my view, moot, and the opinions of the Court addressing that issue are advisory opinions. Prior to the submission of this appeal, the Governor, plaintiff in this action, made his judicial appointments from the names submitted by various judicial nominating commissions. These commissions were formed in compliance with the statutory provision now being challenged. In such a posture, the Governor is not in a position to challenge the constitutionality of the nominating commissions because there is no controversy. Counsel for the parties both conceded before this Court that the issue is nonjusticiable. I agree and think that we

---

**9.** In my view the type of election referred to in Article VII, § 10 is an election subject to contest but not a "retention election" such as employed in some states which is an "election" in the sense that the issue is whether, on the basis of his record, a judge should be retained in office. If that type "election" were the election called for, Senate confirmation would be appropriate because the term "election" as used in Article VII, § 10 was intended to encompass the traditional meaning of the term election and not a "retention election," as called for by the Missouri plan.

should follow well-established rules to the effect that the case which becomes moot on appeal is not justiciable. *Duran v. Morris*, Utah, 635 P.2d 43 (1981); *Baird v. Utah*, Utah, 574 P.2d 713 (1978); *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Not only is the case moot but both parties in effect withdrew the issue on oral argument. That the issue may recur is of no consequence when neither party seeks to have this Court pronounce an opinion on an issue. The opinions on the nominating commissions are, therefore, gratuitous. As to this issue, the case should be remanded to the district court for an order of dismissal.

OAKS, Justice (concurring and dissenting):

I concur that the judicial nominating commissions are constitutional, but I dissent from the majority's holding that the law requiring Senate consent to judicial appointments is unconstitutional.

In brief, I differ with Judge Bullock's opinion that the challenged legislation constitutes an unconstitutional legislative exercise of an executive power, because that opinion fails to show that the power to appoint judges is an executive power under the Utah Constitution. (Part III herein.) I differ with Justice Howe's opinion that this legislative involvement in judicial selection violates the separation of powers by giving the Legislature "control" over the judicial branch, because I see no such control on the facts of this case. (Part IV herein.) While I agree with Justice Stewart's opinion that Senate confirmation of juvenile court judges is constitutional, I differ with his conclusion that Article VII, § 10 prohibits Senate confirmation of judges who are subject to contested elections, because in my view that section neither applies to this case nor describes confirmation and election as mutually exclusive alternatives. (Part V herein.)

## I. SEPARATION OF POWERS

Separation of powers is a foundation principle in our national and state constitutions. In combination with the complementary devices of checks and balances, separation of powers restrains and regulates the exercise of government power in order to protect individual liberties.

Experience with constitutional government has taught that separation of powers must be applied in a practical rather than a doctrinaire manner. The theoretical separateness and independence of each branch of government is important, but something more is needed to assure that the initial independence of one branch will not be used in practice to infringe upon the independence of another, and to assure that the three branches will harmonize their efforts into an effective government. As the United States Supreme Court observed in its most recent holding on the separation of powers in the United States Constitution:

Yet it is also clear from the provisions of the Constitution itself, and from the Federalist Papers, that the Constitution by no means contemplates total separation of each of these three essential branches of Government. . . . The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.

*Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). To counter that danger, our constitutions contain a system of checks and balances under which one branch can directly forestall another branch or participate to some extent in its functions.

This counter-balancing or sharing of powers is not inimical to the principle of separation of powers as that principle is implemented by our constitutions. The objectives of separation of powers are, in fact, achieved more by a dynamic relationship of interdependence among the three branches of government than by doctrinaire walls of

separation dividing them. Justice Robert Jackson gave classic expression to that idea in his concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952), which has been quoted and adopted by the entire Court in two subsequent cases on the separation of powers, *Buckley v. Valeo*, 424 U.S. at 122, 96 S.Ct. at 683, and *United States v. Nixon*, 418 U.S. 683, 707, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974):

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but independence, autonomy but reciprocity.

·A noted constitutional scholar has summarized the practical meaning of the doctrine of separation of powers in these words: "Thus, along both dimensions, that of federalism as well as that of separation of powers, it is *institutional interdependence* rather than *functional independence* that best summarizes the American idea of protecting liberty by fragmenting power." L. Tribe, *American Constitutional Law*, p. 17 (1978).

The principle of separation of powers should therefore be viewed not only in terms of the functional independence of each branch of government, but also in terms of the inevitable and desirable interdependence of each of the three branches, which serves the same purpose.

In the Utah Constitution, the principle of separation of powers is expressed in Article V, § 1, which reads as follows:

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

The two clauses of this section express distinct but complementary aspects of the principle.

The reference to "distinct departments" in the first clause establishes the separateness and independence of each branch of government. It therefore prohibits one department from controlling, dominating, or coercing another to the point that it lacks independence in performing its functions, including its serving as a check upon the other two branches of government. E.g., *Humphrey's Executor v. United States*, 295 U.S. 602, 629–30, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). Justice Howe's opinion, discussed in Part IV herein, relies on this principle.

The prohibition in the second clause against an official in one branch "exercis[ing] any functions" pertaining to another branch is an application of the principle of separation of powers to a circumstance falling short of control or domination but amounting to an invasion by one branch of a part of the prerogatives or functions of another. E.g., *Rampton v. Barlow*, 23 Utah 2d 383, 464 P.2d 378 (1970); *Springer v. Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928). Judge Bullock's opinion, discussed in Part III herein, relies on this clause.

The reasons for my dissent are elaborated in Parts III, IV, and V. Part II provides essential background by reviewing the history and constitutional basis of the power of judicial selection in this state.

## II. HISTORY

From the time of statehood until 1945, district and supreme court judges were chosen by popular election, as required by the original provisions of Article VIII, §§ 2, 5 of the Constitution. Candidates were nominated in political conventions. Article VII, § 10 authorized the Governor to fill vacancies in these offices by appointment, with the appointees serving until their successors were elected and qualified as provided by law. These specific provisions kept judges from being selected under the general provision in the first sentence of Article VII, § 10, still in effect, which provides:

The Governor shall nominate, and by and with the consent of the Senate, appoint all State and district officers whose offices are established by this Constitution, or which may be created by law, and whose appointment or election is not otherwise provided for.

By constitutional amendment effective in 1945, these provisions for the election of judges were deleted, and the following was added to Article VIII, § 3:

Judges of the Supreme Court and district courts shall be selected for such terms and in such manner as shall be provided by law, provided, however, that selection shall be based solely upon consideration of fitness for office without regard to any partisan political considerations and free from influence of any person whomsoever, and provided further that the method of electing such judges in effect when this amendment is adopted shall be followed until changed by law.

From 1945 until 1951, district and supreme court judges continued to be chosen by popular election pursuant to the final proviso of Article VIII, § 3, since the Legislature had not exercised its delegated power to pass a law providing otherwise. In 1951, the Legislature provided for nonpartisan election of district and supreme court judges on the so-called "headless ballot." 1951 Utah Laws ch. 38. The Governor filled vacancies by appointment to serve until the next election. Article VII, § 9.

In 1967, the Legislature enacted a law establishing a judicial nominating commission, consisting of the Chief Justice of the Supreme Court, one commissioner chosen by the Senate, and one by the House of Representatives, two by the Governor, and two by the Utah State Bar Association. The Governor was authorized to fill vacancies in the supreme and district courts "by appointment ... of one of three persons nominated" by the judicial nominating commission, but the persons so appointed were subject to election by the voters at the next succeeding general election. 1967 Utah Laws ch. 35.

Since 1967, district and supreme court judges have been appointed by the Governor from the three persons nominated by the judicial nominating commission. In those 14 years, which included the selection of numerous judges, the nominating commissions have not been challenged as a violation of the separation of powers. In fact, the commission's composition of designated representatives of all three branches of government and of the legal profession, who must be equally divided according to political affiliation, seems well calculated to offset concerns about disproportionate influence from any particular faction in the selection of judges. Limiting the Governor to appointing one of three persons so nominated is an appropriate implementation of the constitutional command that "selection shall be based solely upon consideration of fitness for office without regard to any partisan political considerations...." Article VIII, § 3.

The controversy in this case arose in 1981 when the Legislature, over the Governor's veto, provided that the Governor's appointments of district, circuit, juvenile, and supreme court judges must be made "with the advice and consent of the Senate." 1981 Utah Laws ch. 106, §§ 1, 2, 3.

## III. SELECTION OF JUDGES AS AN EXECUTIVE POWER

It is easy to demonstrate that the separation of powers principle in the Utah Constitution forbids legislative exercise of a function of another branch. That circumstance is covered by the plain language of the second clause of Article V, § 1, and that was the holding in *Rampton v. Barlow, supra,* (executive function), and *In re Handley's Estate,* 15 Utah 212, 49 P. 829 (1897) (judicial function). There will be circumstances where it is difficult to distinguish between the forbidden intermingling of functions, on the one hand, and the inevitable and desirable interdependence of the three branches of government, on the other. But that difficulty is not a matter of controversy in this dissent. My difference with Judge Bullock's opinion lies in my conclusion that it has failed to demonstrate

that the power to select judges is one of the "functions appertaining to" the executive department under the Utah Constitution. Unless the Constitution confers that power on some branch other than the legislative, the second clause of Article V, § 1 obviously does not condemn the exercise of some of that power by the legislative branch.

The assertion or assumption that the appointment of judges is an executive power or function is an explicit premise in Judge Bullock's opinion and is implicit in the other opinions explaining the majority's result. But the existence of such an important power must be demonstrated by identifying its source. Questions addressed to the sources of government power are not technical or academic questions. The courts should be vigilant to scrutinize the sources of, as well as the limitations upon, the powers exercised by any branch of government. Since it is not granted expressly in our Constitution, any executive power of this nature must be inherent in the executive or impliedly granted in other provisions of the Constitution.

Article I, § 2 of the Utah Constitution expresses a fundamental principle of American political life: "All political power is inherent in the people; . . . ." The executive, legislative, and judicial branches of government may exercise only the powers conferred on them by the people through the Constitution or through statutes enacted under the Constitution. Conversely, if the people have not conferred a power on any of these branches of government, they do not have it. The idea that the executive can possess a power not actually delegated by the people typifies a monarchy and is repugnant to a republic where the people, not the crown, are sovereign.

Our Constitution does not expressly confer the power to appoint judges on the executive or on any other branch of government. Until 1967, the Constitution provided that judges would be selected by popular election, with executive power to fill vacancies until the next election. Since 1967, judges have been appointed by the execu-

tive pursuant to statutory authority in the legislation creating the judicial nominating commissions. The power to enact that legislation was specifically conferred by Article VIII, § 3 of the Constitution, quoted above. The only constitutional provision authorizing executive appointment of judges is the general provision in Article VII, § 10, also quoted above, which provides that the Governor shall appoint "by and with the consent of the Senate" all state and district officers whose appointment or election is not otherwise provided for.

The Utah Constitution provides no basis for an implied power in the executive or Legislature to appoint judges. The very existence of an express constitutional provision (Art. VIII, § 3) specifying that judges shall be selected as provided by law stands as an insurmountable barrier to the existence of an implied power on the same subject. The separation of powers provision in Article V, § 1, which forbids one branch from exercising "any functions appertaining to either of the others," provides no basis for implying a power of judicial selection in any branch of government. "The separation of powers is a limitation and not a grant" of power; "it does not designate the character of the appointive power. . . ." 1 Sutherland, *Statutes and Statutory Construction* § 3.20 (4th ed. D. Sands 1972).

The power to select judges is not inherent in the executive or any other branch of government. The idea of inherent powers is repugnant to our government of popular sovereignty and delegated powers.

Tradition obviously demonstrates the acceptability and workability of executive appointment of judges, just as in the United States Constitution, where judges are appointed by the executive with the consent of the senate.[1] Like Utah, a large majority of states have executive appointment of judges. But this "tradition" proves rather than contradicts the rule that the power to appoint judges is not inherent in the executive. A majority of state governors exer-

---

1. U.S.Const.Art. II, § 2, ¶ 2.

cise judicial appointive power—usually to fill interim vacancies—for the straightforward reason that a majority of state constitutions expressly grant their governors this power.[2] In a few states, the legislature appoints judges,[3] or dominates the selection process,[4] a practice that also prevailed in five of the original thirteen states at the time the United States Constitution was adopted.[5] But these practices do not prove that the power of judicial selection is inherent in the Legislature, only that the power resides where the individual states, through their constitutions, have seen fit to place it.[6]

So far as I am aware, the authorities are unanimous in holding that the power of judicial selection is not an inherent executive power. E.g., *State ex rel. Swope v. Mechem*, 58 N.M. 1, 265 P.2d 336, 338 (1954); 48A *C.J.S.*, Judges §§ 12, 13 (1981); 46 *Am.Jur.2d*, Judges § 9 (1969). In fact,

the weight of authority holds that the power to appoint nonjudicial government officers does not reside in the executive inherently or by implication, but only as specifically granted by state constitutions or statutes.[7] As to judicial officers, the opinions of members of the majority have failed to cite a single state whose governor exercises the power to appoint judges inherently, by implication, by tradition, or by any authority other than a specific grant of such power by the constitution or laws of the state.[8]

Since there is no basis for holding that the Utah Constitution makes the power to appoint judges an executive power, I cannot see how legislative participation in the selection process can violate the second clause of Article V, § 1. The irony behind the majority's argument of unconstitutionality is that the source of the executive power to participate in the selection process is pre-

**2.** E.g., Ala.Const.Art. VI, Amend. No. 328, § 6.14; Alaska Const.Art. IV, § 5; Ariz.Const. Art. VI, § 37; Ark.Const.Art. VI, § 23; Cal. Const.Art. VI, § 16; Colo.Const.Art. VI, § 20. Appointment procedures are summarized in Am.Jur.2d Desk Book, Item No. 76 (Supp. 1981).

**3.** R.I.Const.Art. X, § 4; S.C.Const.Art. V, § 3; Va.Const.Art. VI, § 7.

**4.** Vt.Const. Ch. II, § 32; Vt.Stat.Ann. tit. 4, §§ 601, 602.

**5.** The Federalist, No. 47.

**6.** A law giving the Legislature an unshared power to appoint judges would pose very serious questions of constitutionality under Article V, § 1 of the Utah Constitution. But that question is not posed by the facts of this case. See text at note 9, infra.

**7.** *Fox v. McDonald*, 101 Ala. 51, 13 So. 416, 420–21 (1893); *Cox v. State*, 72 Ark. 94, 78 S.W. 756, 757 (1904); *State ex rel. Craven v. Schorr*, 50 Del. 365, 131 A.2d 158, 163 (1957); *Leek v. Theis*, 217 Kan. 784, 539 P.2d 304, 317–20 (1975); *Buchholtz v. Hill*, 178 Md. 280, 13 A.2d 348, 350–52 (1940); *Thorne v. Squier*, 264 Mich. 98, 249 N.W. 497, 500, 89 A.L.R. 126 (1933); *State ex rel. Standish v. Boucher*, 3 N.D. 389, 56 N.W. 142 (1893); *State ex rel. Haines v. Rhodes*, 168 Ohio St. 165, 151 N.E.2d 716, 719 (1958); *Heyward v. Long*, 178 S.C. 351, 183 S.E. 145, 156 (1935); *Richardson v. Young*, 122 Tenn. 471, 125 S.W. 664, 669 (1910); *State ex rel. Wayne v. Sims*, 141 W.Va. 302, 90 S.E.2d 288, 291 (1955); *People ex rel.*

*Warren v. Christian*, 58 Wyo. 39, 123 P.2d 368, 371 (1942); 1 Sutherland, Statutes and Statutory Construction § 3.20 (4th ed. D. Sands 1973); 63 Am.Jur.2d, Public Officers and Employees § 91 (1972).

A minority of states hold that the power to appoint government officers is intrinsically, though not necessarily exclusively, executive. *Tucker v. State*, 218 Ind. 614, 35 N.E.2d 270, 284 (1941); *In re Opinion of the Justices*, 303 Mass. 615, 21 N.E.2d 551 (1939); *State ex rel. Johnson v. Myers*, 74 N.D. 678, 19 N.W.2d 745 (1945); *Daly v. Hemphill*, 411 Pa. 263, 191 A.2d 835 (1963). However, even these states apparently do not consider the power to appoint *judges* intrinsically executive. See, e.g., *Tucker v. State*, 35 N.E. at 285.

**8.** The claim that *In re Advisory Opinion to the Governor*, Fla., 276 So.2d 25 (1973), supports the proposition that the power of judicial appointment is "inherently an executive function" is unfounded. Since Article V, § 11 of the Florida Constitution specifically provides that "[t]he governor shall fill each vacancy in judicial office by appointing ... one of not fewer than three persons nominated by the appropriate judicial nominating commission," the power of judicial appointment in that state is derived from a specific constitutional grant and is not "inherent" in the sense that it exists independent of such a constitutional provision. (The advisory opinion held that the commissioners themselves, not the governor, had inherent power to promulgate rules governing the operation of constitutionally established judicial nominating commissions.)

cisely the same as the source of the legislative power to participate. Both branches trace their authority to the same statute enacted pursuant to express delegation in the same constitutional provision, Article VIII, § 3, quoted above. I cannot see how this law can be constitutional as to the Governor's power and function but unconstitutional as to the Legislature's power and function.

## IV. LEGISLATIVE CONTROL OVER THE JUDICIARY IN THE APPOINTMENT OF JUDGES

Article V, § 1 of the Constitution provides that "[t]he powers of the government of the State of Utah shall be divided into three distinct departments ...." I agree that there is a point at which one branch's control over another would violate the distinctness mandated by this section. However, I do not agree that that point has been reached in this case.

Justice Howe's opinion argues that Senate consent to judicial appointments, in combination with the Legislature's right to designate two members of the seven-member judicial nominating commission, tips the scales into unconstitutionality by giving the Legislature, in effect, unlimited control over the judicial branch. I dissent from that conclusion, since I believe that the level of legislative control over the judicial branch in the statutes at issue in this case falls far short of offending the prohibition against one branch controlling or dominating another. The procedure outlined in these statutes exemplifies the sharing of powers and the interdependence of different branches of government discussed in Part I, which are familiar manifestations of separation of powers and checks and balances. Indeed, despite the variety of appointment and removal provisions at work in the 50 states of our nation over its 200-year history, the majority has failed to cite a single case where a law has been held unconstitutional on the basis of one branch's control of another. This suggests that more than minimal control is required for a finding of unconstitutionality.

In determining the constitutionality of the level of legislative control of the judiciary permitted by the appointment legislation challenged here, we must be mindful of two vital principles of law and construction. First, statutes are presumed to be constitutional, and will not be invalidated if, resolving every reasonable doubt in favor of their constitutionality, there is any reasonable basis upon which they can be sustained. *Zamora v. Draper*, Utah, 635 P.2d 78, 80 (1981); *Greaves v. State*, Utah, 528 P.2d 805, 806–7 (1974); *Trade Commission v. Skaggs Drug Centers, Inc.*, 21 Utah 2d 431, 446 P.2d 958 (1968); *State v. Packard*, 122 Utah 369, 373, 250 P.2d 561, 563 (1962); *Broadbent v. Gibson*, 105 Utah 53, 62, 140 P.2d 939, 943 (1943). Second, "It is a well-established rule of constitutional law that where there are two alternatives as to the interpretation of a statute, one of which would make its constitutionality doubtful and the other would render it constitutional, the latter will prevail." *Wagner v. Salt Lake City*, 29 Utah 2d 42, 49, 504 P.2d 1007, 1012 (1972). *Accord, Gord v. Salt Lake City*, 20 Utah 2d 138, 143, 434 P.2d 449, 453 (1967); *State Water Pollution Control Board v. Salt Lake City*, 6 Utah 2d 247, 255, 311 P.2d 370, 375 (1957). As a result of these well-settled principles, all doubts must be resolved in favor of constitutionality, and the Court is obligated to adopt any reasonable construction of a statute that will assure its constitutionality in preference to any construction that would jeopardize it.

These principles surely refute the district court's construction of the Senate's power of "advice and consent" as, in effect, a power to appoint its own preference among the three persons nominated by the commission. Being required to adopt the construction that will sustain constitutionality, we should conclude that the Senate's power is not a power to appoint but only a power to veto. If an appointment is vetoed, the nominating commission must again submit three names, so the Governor can again exercise his statutory power to appoint one

of three nominees.[9] The Senate cannot veto in succession two of the three persons originally nominated by the commission and thus preempt the Governor's power of appointment.

It is hard to see how the Senate's veto power can be an effective instrument of control when its exercise is so strictly limited by our Constitution. Article VIII, § 3 binds each department of government to exercise its powers of judicial selection "solely upon consideration of fitness for office without regard to any partisan political considerations and free from influence of any person whomsoever...." Consequently, unlike appointments made under other legal authority, gubernatorial appointments under Article VIII, § 3 can be vetoed by the Senate only when the appointee can be shown to be unfit for office.[10] Like other constitutional limitations regulating the process of selecting judges,[11] this restriction is enforceable in the courts. This Court's decision in *Rampton v. Barlow, supra*, though not in point in resolving the question posed in this case,[12] shows that the courts will provide a remedy where constitutional limitations are exceeded in the appointment process.

In addition to the Senate's power to veto, each house of the Legislature has the power to designate one commissioner on the seven-member judicial nominating commission. In total, the Legislature designates two of seven, the same number as the Governor. Since these two branches designate the same number of persons on the judicial nominating commission, and the Governor has the power to appoint one of the three nominees while the Senate only has a limited veto power, how can the judicial branch be "controlled" by the Legislature? On the contrary, the balance of power seems to be in the Governor's favor. In any case, the power of judicial selection is shared sufficiently to protect the judicial branch from control or domination by either of the others.

It is also said that the Legislature's power to impeach public officers, including judges, "for high crimes, misdemeanors, or malfeasance in office," Article VI, § 19, and its power, upon a two-thirds vote of both houses, to remove a judge for "cause," Article VIII, § 11, makes the legislative control even more offensive. But these constitutional provisions do not grant the Legislature *carte blanche* power to replace judges. The decisions of legislative bodies are final and unreviewable on the questions the Constitution commits to their judgment, but the courts can always review whether they have acted outside their jurisdiction or otherwise in excess of their powers. *Ferguson v. Maddox*, 114 Tex. 85, 263 S.W. 888, 893–94 (1924). *Cf. Powell v. McCormack*, 395 U.S. 486, 506, 549, 89 S.Ct. 1944, 1956, 1978, 23 L.Ed.2d 491 (1969). This would

---

9. The statute gives the Governor the right to appoint from a list of "three persons named on the list of nominees" received from the judicial nominating commission. U.C.A., 1953, § 20–1–7.6(2) and (3). The clear inference from this provision is that if the Senate rejects an appointment, the judicial nominating commission must submit a new slate of three persons to the Governor. This is the procedure specified in similar circumstances in Montana. Mont.Rev. Codes Ann. § 3–1–1013 (1981); Mont.Const. Art. VII, § 8(1).

10. It is difficult to see how the Senate can dominate the judiciary by possessing a veto power efficacious only against unfit appointees. That is surely a feeble dominance, unless one contends that the Governor has a constitutional right to appoint a person who cannot, after being vetoed by the Senate, persuade the courts that he or she is fit for judicial office.

11. The lawmaking power delegated under Article VIII, § 3, is limited by express constraints pertaining to judicial selections, including those specifying requirements of age, residency, and membership in the Bar, Article VIII, § 2, and those excluding criteria based on "partisan political considerations," Article VIII, § 3, or religious tests or property qualifications for public office, Article I, § 4.

12. Neither the holding nor the theory of that case has anything to do with judicial selection. The evil proscribed in *Barlow* was the interference of the legislative branch in the internal operation of the executive branch by appointing subordinate officers of the executive branch and, in effect, controlling part of its operations.

include correction of actions taken without the due process appropriate to the circumstances or without a reasoned finding of the guilt or "cause" required by the Constitution. Consequently, these provisions add relatively little to the Legislature's quantity of control over the judicial branch.

In view of the intricate system of limitations, checks, and balances involved in the selection of judges, involving the electorate (who vote on appointees at the next general election) and representatives of all three branches of government and the State Bar, the contention that the Legislature's right to appoint two of seven members of the nominating commission, to veto the Governor's appointment, and to remove for cause amounts to control or dominance over the judicial branch strikes me as entirely unpersuasive. This kind of shared or balanced power is commonplace in the interaction of the three branches of our government.[13] It is entirely consistent with the interdependence of the three branches of government that is an essential complement of the separation of powers. To hold that this limited interdependence violates the separation of powers is to run counter to practical experience with constitutional government and to invite a flood of pointless litigation challenging official acts.

## V. THE REQUIREMENTS OF ARTICLE VII, § 10

I am also unable to agree with Justice Stewart's opinion that the constitutional power to enact laws specifying the manner of selection of judges cannot be exercised to require both Senate confirmation and contested election. My difference with Justice Stewart stems from a difference on the source of executive and legislative power to participate in the selection of judges.

In my opinion, the Governor's power to appoint and the Senate's power to confirm judicial appointments are rooted in Article

VIII, § 3, which provides that judges shall be selected "in such manner as shall be provided by law . . . ." As noted in Parts III and IV, I concede that laws enacted under that section must be consistent with constitutional limitations, including the separation of powers principles in Article V, § 1, but I conclude that the laws providing for judicial nominating commissions, gubernatorial appointment, Senate confirmation, and ensuing election meet that test.

Although Justice Stewart's opinion cites Article VIII, § 3, I can only interpret its reasoning as a rejection of that section and its implementing legislation as a source of power for executive appointment and Senate confirmation or veto. Thus, he states that the Governor's power of appointment and the Senate's power of confirmation are both granted by Article VII, § 10. He also states that both of these powers are subject to the limitations he finds in Article VII, § 10, notably that the law cannot require both Senate confirmation and popular election. Finally, he states that the Senate's power of confirmation is not a legislative power but "an appointive power," which cannot be exercised by a legislative body without the specific authorization he finds only in Article VII, § 10. In this context, this contrast between "legislative" and "appointive" powers persuades me that Justice Stewart equates "appointive power" with executive power and impliedly joins the other opinions in concluding that the power to select judges is inherent in the executive branch except as expressly limited by the Constitution. I have four disagreements with the analysis in his opinion.

*First,* for the reasons detailed in Part III, I reject the idea that the executive under our Constitution has an inherent power to select judges. The power to select judges exists where the Utah Constitution expressly places it: in the authorities designated

---

**13.** For example, (1) a statute enacted pursuant to a constitutionally delegated power, Article VI, § 13, gives the Governor the power to appoint a person to fill a vacancy in the Legislature, U.C.A., 1953, § 20–1–5, and (2) the Governor can also veto the *actions* of the Legislature,

Article VII, § 8 (not just appointments to that body). Does this combination of powers, which exceeds by a wide measure those the Legislature exercises in the judicial appointment process, constitute executive "control" of the Legislature?

by a law enacted under Article VIII, § 3 (provided the law is constitutional), or, in the absence of such a law, in the authorities the Constitution designates in Article VII, § 10.

*Second*, I do not accept Justice Stewart's apparent premise that the terms of Article VII, § 10 limit the power to select judges under legislative enactments pursuant to Article VIII, § 3 or any other constitutional provision. Article VII, § 10 merely specifies a procedure for selecting state officers "whose appointment or election is not otherwise provided for." It is a backup measure designed to prevent the dilemma of a legally authorized office without a legally prescribed method for filling it. *Rampton v. Barlow*, 23 Utah 2d at 385, 464 P.2d at 379. Since the "appointment or election" of judges is "otherwise provided for" by Article VIII, § 3 and legislation thereunder, Article VII, § 10 is, by its own terms, inapplicable to this case. If there is no alternate selection mechanism for other state officers, they will be selected under Article VII, § 10, and subject to its limitations, but that is not the case with judges.

*Third*, I also disagree with Justice Stewart's interpretation of the terms of Article VII, § 10. The selection mechanism prescribed in the first sentence of that section does not apply as to officers "whose appointment or election is . . . otherwise provided for." The laws challenged here require that district, circuit, and supreme court judges shall be subject to election following their appointment and confirmation. As a result of that requirement, he concludes that Senate confirmation cannot also be required. But why does the fact that judges must stand for election invalidate the Senate's power to confirm but not the Governor's power to appoint? The answer lies in the apparent premise that the power to appoint is an executive power, existing independent of its conferral in Article VII, § 10, but subject to regulation by it. Thus, as he says, the references to senatorial consent and election in that section are alternative checks on the appointive power of the Governor. But since the Governor's power is not dependent on its con-

ferral in Article VII, § 10, the law requiring an election, which renders senatorial confirmation invalid under his view of that section, does not invalidate the Governor's power. Since I reject the premise, I also reject the conclusion that senatorial consent and popular election are permissible in the alternative but not together.

*Fourth*, I also disagree with Justice Stewart's conclusion that the issue of the constitutionality of the judicial nominating commission is moot. In his complaint in this case, the Governor seeks a judgment declaring that the statute establishing the composition of the nominating commission is unconstitutional. So long as the Governor has an appointive role in filling judicial offices that may become vacant at any time, his complaint is justiciable under the declaratory judgment statutes, U.C.A., 1953, § 78–33–1 *et seq.*, and cannot be mooted by appointments he has made in the past. This is especially true since the Governor had to make an appointment during the pendency of this litigation in order to preserve his rights under U.C.A., 1953, § 20–1–7.6(3), which specifies that if "the governor fails to appoint one of the three [nominees] within 30 days . . . the chief justice of the Supreme Court shall forthwith appoint one of the persons named on the list . . . ." Since 30 days is obviously an insufficient period to litigate the controversy, even if this case were technically mooted by an appointment it would nevertheless be justiciable under "well-established rules which permit a court to litigate an issue which . . . is of wide concern, affects the public interest, is likely to recur in a similar manner, and, because of the brief time any one person is affected, would otherwise likely escape judicial review [citations omitted]." *Wickham v. Fisher*, Utah, 629 P.2d 896, 899 (1981).

## VI. CONCLUSION

For the reasons set out above, I find no constitutional infirmity in the laws, enacted pursuant to Article VIII, § 3 and consistent with separation of powers principles, which utilize nominating commissions, gubernato-

rial appointment, senatorial confirmation, and popular election in the selection of judges.

I reach my conclusion notwithstanding my skepticism about the desirability of a law requiring Senate confirmation of judicial appointments. Participation in judicial selection by a Legislature that is only occasionally in session may delay the process of filling judicial vacancies and thereby hamper the courts in overcoming current heavy caseloads, even as the supreme and district courts have been hampered by the delays incident to resolving this controversy. But the wisdom or desirability of legislation is a matter for the constitutional lawmakers—the Legislature, subject to executive veto.

"It does not lie within the province of the court to pass upon the wisdom, the need or the desirability of any legislation, nor to choose between two opposing political philosophies." *Trade Commission v. Skaggs Drug Center, Inc.*, 21 Utah 2d at 439, 446 P.2d at 963. The only question before this Court is whether the legislation providing for judicial selection is constitutional. I have no doubt that it is.